Juan C. COPLEY and Hoyt Stephens, Complainants-Appellants,

v.

COUNTY OF FENTRESS and P. G. Crooks, County Judge, Defendants-Appellees.

Court of Appeals of Tennessee, Middle Section.

June 30, 1972.

Certiorari Denied by Supreme Court Feb. 5, 1973.

———◆———

Aron P. Thompson, Cookeville, John E. Appman, Jamestown for complainants-appellants.

Neal & Craven, Jamestown, for defendants-appellees.

## OPINION

PURYEAR, Judge.

This is a suit in which the complainants seek a restraining order enjoining and restraining Fentress County and the County Judge of said County from constructing an industrial building pursuant to a resolution of the County Court passed on November 17, 1971.

The case was tried before the Honorable Scott Camp, Chancellor, on April 7, 1972, and a decree was entered on April 27, 1972, dismissing the suit and taxing the costs thereof against the complainants.

There is no dispute about the facts of the case, which may be briefly stated as follows:

The complainants are duly elected members of the Quarterly Court of Fentress County and the defendant, P. G. Crooks, is the duly elected County Judge of said County.

Over a period of several years prior to 1971 Fentress County, to which we will hereinafter refer as "The County", included in each of its annual budgets a certain sum for industrial development and, at the beginning of the fiscal year 1971–1972, the sum of $158,500.00 for industrial development had thus been accumulated, of which $21,761.66 had been expended, thus leaving approximately $137,000.00 in unexpended funds accumulated for this purpose.

At some time during the early part of the year 1971, certain officials of the County, including the County Judge, entered into negotiations with Colonial Corporation of America with the view of reaching an agreement whereby the County would construct an industrial building on a tract of land owned by the County and lease said building to Colonial to be used as a shirt factory in which approximately 250 local residents would be employed.

Although no formal agreement has yet been consummated, it has been tentatively agreed by the County, through its County Judge, that the County will construct said building at a cost of approximately $150,000.00 and that Colonial will lease such building for fifteen years at an annual rental of $10,000.00 of which $50,000.00 is to be paid by Colonial in advance.

Pursuant to this tentative agreement, the County Court of said County passed the following resolution on November 17, 1971:

"Be it resolved by the Quarterly County Court of Fentress County, Tennessee that the County Finance Committee on Idle Funds is hereby authorized and directed to determine the amount of county industrial funds of Fentress County which have heretofore been placed in the county general fund and to withdraw from the county general fund $105,000.00 of such industrial funds and have same placed in and deposited to an industrial fund account. Said committee is also authorized and directed to use said industrial funds for the construction of an industrial building at Clarkrange in accordance with the proposals heretofore discussed and agreed upon by and between the Quarterly County Court and the Colonial Shirt Corporation, said proposals heretofore having been approved by the Quarterly County Court by majority vote. Said committee will also

take bids for the construction of said building and proceed as soon as possible towards the construction and completion of said building and related facilities thereto and will otherwise supervise said industrial development project in accordance with the directions of the Quarterly County Court and in accordance with the proposals heretofore mentioned.

It appears to the Court that the welfare of the County requires this action." (Rec. p. 2)

Since it is not necessary for the County to borrow any money for the purpose of obtaining funds with which to construct said building, no bonds or other obligations for borrowed money are to be issued for the purpose of constructing said building.

The only work which had been done at the time this suit was filed was certain grading, excavating and site preparation upon a tract of approximately six acres of land owned by the County located at Clarkrange on Highway 127 in Fentress County, Tennessee. No referendum or election has been held for the purpose of obtaining approval of the qualified voters of said County for the construction of said building.

It is undisputed that from the years 1960 to 1970 Fentress County has sustained a net population loss of somewhere between five and eight percent over this ten year period due to the fact that residents of the County have moved elsewhere in an attempt to obtain better employment.

It is also undisputed that the County will continue to own said building after it is constructed and it is not contemplated that the County will give Colonial any option to purchase same.

With the possible exception of some incidental questions, the main questions involved on this appeal are as follows:

(1) Does Fentress County have the authority to construct an industrial building to be used by a private industry which will employ local citizens?

(2) Is it necessary for an election to be held for the purpose of obtaining approval of three-fourths of the qualified voters voting in such election before such industrial building can be constructed with the use of County funds?

The complainants have filed six assignments of error and the foregoing two questions are raised by five of said assignments, so we will not consider and discuss assignments two, three, four, five and six separately but will consider all of them in determining the main questions raised thereby.

The answer to the first question has been provided by the Supreme Court in McConnell v. City of Lebanon (1958), 203 Tenn. 498, 314 S.W.2d 12, and also by Sections 6–2902 and 6–2903 T.C.A., the pertinent provisions of which are as follows:

"6–2902. *Definitions.*—Whenever used in this chapter, unless a different meaning clearly appears from the context:

(1) The term 'industrial building' shall mean any one (1) or combination of two (2) or more buildings, structures, or facilities to be used as a factory, mill, shop, processing plant, assembly plant, fabricating plant, ship canal, port or port facility, dock or dock facility, harbor facility, and railroads, railway terminals, railway belt lines and switches, to be rented or leased to an industrial concern by the municipality, and the term 'enterprise' shall mean the industrial operation or operations to be carried on in such industrial building.

(2) The term 'municipality' shall include any county, or incorporated city or town of the state."

"6–2903. *Powers of municipality—Restrictions and limitations.*—In addition to powers which it may otherwise have in its charter or the laws of this state, any

municipality shall have the power under this chapter subject to the conditions, limitations and restrictions herein provided:

(1) To construct, acquire by gift or purchase, reconstruct, improve, better or extend any industrial building within or without the municipality or partially within or partially without the municipality, but in no event farther than ten (10) miles from the territorial boundaries of such municipality, and to acquire by gift or purchase lands or rights in land in connection therewith.

(2) To issue its bonds to finance in whole or in part the cost of the acquisition, purchase, construction, reconstruction, improvement, betterment or extension of any industrial buildings, including the acquisition of lands or rights in land in connection therewith. The governing body of the municipality in determining such cost may include all cost and estimated cost of the issuance of said bonds, all engineering, inspection, fiscal and legal expenses, and interest which it is estimated will accrue during the construction period and for six (6) months thereafter on money borrowed or which it is estimated will be borrowed pursuant to this chapter.

(3) To rent or lease such industrial buildings to industrial concerns in such manner that rents to be charged for the use of the industrial buildings shall be fixed and revised from time to time so as to produce income and revenues sufficient to provide for the prompt payment of interest upon all bonds issued hereunder and to create a sinking fund to pay the principal of such bonds when due, and to provide for the operation and maintenance of such industrial buildings and for an adequate depreciation account in connection therewith."

These Code Sections were enacted in 1955 and in commenting upon them, the Supreme Court said in McConnell v. City of Lebanon, supra:

"In one of the later cases involving a condemnation proceeding, that is, Knoxville Housing Authority, Inc., v. City of Knoxville, 174 Tenn. 76, 83, 123 S.W.2d 1085, 1087, the late Mr. Chief Justice Green, after stating the insistence of the property owners whose property was about to be condemned, that the Housing Authority was not a public use, had this to say:

'The courts reason that the primary object of all government is to foster the health, morals and safety of the people. That slum districts with their filthy, congested, weather-exposed living quarters are breeding places of disease, immorality and crime. The character of the houses in such districts make of them a fire hazard. The existence of such districts depresses the taxable value of neighboring property and deprives the State of revenue. The State is also put to great expense in combating disease, crime and conflagration originating in such localities. They menace not only the health, safety and morals of those living therein, but since disease, crime, immorality and fires can with difficulty be confined to points of origin, these districts are a menace to the whole community—indeed, a menace to the State.

'Without dissent, therefore, the courts have reached the conclusion that slum clearance was a public purpose and that Housing Authorities serve a public use.' "

\*    \*    \*    \*    \*    \*

"This Court will take judicial notice of the change in the agricultural economy of this section of the country due in a large measure to the mechanization of farm operations, thus causing the country people to move to the towns and cities where work is available and, if work is not available in those places within the State, then the emigration occurs to other states, principally where industrial jobs and a weekly payroll are available.

Under such conditions as are made to appear herein, as well as what is judi-

cially known by this Court, is the State held to be powerless and to be forced to remain supine and impotent? We think not."

\* \* \* \* \* \*

"The alternative of the failure to do so is to make probable a gradual lowering of the standard of living of the mass of citizens of this State. An inadequate number of jobs means an oversupply of labor, which usually results ultimately in a lowering of wages. Low wages and unemployment are twin evils that usually lead to a sub-standard diet, hunger, ill health and even crime.

To provide against such evils is clearly a public or corporate purpose. To accomplish that purpose, the legislature may provide any method or means not prohibited by the Constitution, State or Federal. By the within statute it is sought to be accomplished by authorizing a city or a county, acting under reasonable safeguards provided by the statute, to lend its aid to a private corporation, if approved by vote of the people in accordance with the second section of Art. II, Section 29." McConnell v. City of Lebanon, supra, pp. 511, 512, 514, 515, 516, 517, 314 S.W.2d pp. 18, 19, 20.

■ Therefore, we hold that the County is authorized to construct said industrial building. The complainants make no question about the fact, that in making the appropriation for this purpose, the County Court might not have complied with the County Budgeting Law of 1957 (T.C.A. 5–1201 through 5–1214).

In the trial Court, complainants did not raise any question about whether or not a certificate of public purpose and necessity has been issued pursuant to T.C.A. 6–2905 and 6–2906 and in their brief filed on appeal, they make only casual reference to the requirements of these last mentioned Code Sections, but not insisting there was no compliance with same. Therefore, these questions need not be considered and they are pretermitted.

The answer to the second question depends upon the construction to be placed upon Section 29 of Article II of the Constitution of the State of Tennessee. The pertinent provision of that portion of the Constitution is as follows:

"The General Assembly shall have power to authorize the several counties and incorporated towns in this State, to impose taxes for County and Corporation purposes respectively, in such manner as shall be prescribed by law; and all property shall be taxed according to its value, upon the principles established in regard to State taxation. *But the credit of no County, City or Town shall be given or loaned to or in aid of any person, company, association or corporation, except upon an election to be first held by the qualified voters of such county, city or town, and the assent of three-fourths of the votes cast at said election.*" (Emphasis supplied)

Complainants insist that the challenged action of Fentress County Court violates the spirit and letter of said constitutional provision in that it results in the credit of said County being given or loaned to or in aid of a private corporation without the approval of the voters as required by said constitutional provision.

However, we do not agree that the challenged action of the County Court constitutes giving or lending of credit of said County for any illegal purpose in view of the uncontroverted fact that the County is not borrowing any money for such purpose.

The word "credit" as used in context of this provision of the Constitution necessarily implies the issuance of obligations payable at some future time.

As applied to the question raised here, Webster's Third New International Dictionary defines credit as follows:

"An amount or limit to the extent of which a person may receive goods or

money for payment in the future; time given for payment for goods or services sold for future payment."

In Black's Law Dictionary, Fourth Edition, the plural of the word "credit" is defined as follows:

"A term of universal application to obligations due and to become due."

In Nohrr v. Brevard County Educational Fac. Authority (1971), 247 So.2d 304, the Supreme Court of Florida considered this precise question in construing Article VII, Section 10 of the Florida Constitution, which contains the following provision:

"Neither the state nor any county, school district, municipality, special district, or agency of any of them, shall become a joint owner with, or stockholder of, or give, lend or use its taxing power or credit to aid any corporation, association, partnership or person. . . ." Supra, p. 308.

In that case, the Florida Court said:

"The word 'credit', as used in Fla.Const., art. VII, § 10 (1968) implies the imposition of some new financial liability upon the State or a political subdivision which in effect results in the creation of a State or political subdivision debt for the benefit of private enterprises." (Supra, p. 309).

In Engelking v. Investment Board (1968), 93 Idaho 217, 458 P.2d 213, the Supreme Court of Idaho also considered the same question in construing Article VIII Section 2 of the Idaho Constitution, which contains the following provision:

"The credit of the state shall not, in any manner, be given, or loaned to, or in aid of any individual, association, municipality or corporation; nor shall the state directly or indirectly, become a stockholder in any association or corporation. . ." (Supra, p. 216).

In that case, the Idaho Court said:

"The word 'credit' as used in this provision implies the imposition of some new

financial liability upon the State which in effect results in the creation of State debt for the benefit of private enterprises. This was the evil intended to be remedied by Idaho Const. art. 8, § 2, and similar provisions in other state constitutions." (Supra, p. 218).

■ Therefore, we adopt the reasoning of the Florida and Idaho Courts and hold that the word "credit", as used in Article II Section 29 of the Tennessee Constitution implies the imposition of some new financial liability upon a county, city or town which in effect results in creation of a public debt for the benefit of private enterprises and this was the evil intended to be prevented by said constitutional provision.

■ It necessarily follows, therefore, that it was not necessary for any election to be held for the purpose of obtaining approval of the voters for the construction of the building in question here.

■ Under their first assignment of error, complainants insist that the Chancellor erred in finding that the County would at all times own the building in question and that the County could use same for public purposes.

The County Judge, Honorable P. G. Crooks, testified as follows:

"Q. With regard to this industrial building, that the County Court voted, who will own that building?

A. Fentress County.

Q. And a, . . what will Colonial pay Fentress County for the use of the building?

A. Well, we've not completed a contract yet, but we've got a firm *committment* that they will allow Ten Thousand Dollars ($10,000.00) a year and amortise the entire building in fifteen (15) years, and besides that they will rent that, . . . if we will rent the building to them, which we have the control of the building, we'll rent it to whoever we

want to. But if we will rent the building to them, they will advance us Fifty Thousand Dollars ($50,000.00) which is five (5) years rent, then continue for the next ten (10) years to pay us Ten Thousand Dollars ($10,000.00) a year rent which would amortise the entire building in ten (10) to fifteen (15) years, and in fact, if you count that Fifty Thousand Dollars ($50,000.00), that they've paid up in rent, we'll clear Six Thousand Dollars ($6,000.00) a year on our rent, and pay for the building; and the building will belong to Fentress County, and not Colonial." (Rec. pp. 132, 133).

This testimony is undisputed and therefore, there is no merit in the first assignment.

All of the assignments of error having been considered and found to be without merit, said assignments are respectfully overruled and the decree of the trial Court is affirmed. The complainants-appellants will pay all of the costs of this appeal.

SHRIVER, P. J., and TODD, J., concur.