## Duncan E. RAGSDALE, et ux.

v.

## The CITY OF MEMPHIS, et al.

Court of Appeals of Tennessee,
Western Section, at Memphis.

Aug. 17, 2001.

Permission to Appeal Denied by
Supreme Court Dec. 10, 2001.

Leo Bearman, Jr., Elizabeth E. Chance, Dedrick Brittenum, Jr., Thomas C. Quinlen, Memphis, for Appellant, Shelby County, Tennessee.

Allan J. Wade, Memphis, for Appellant, City of Memphis.

J.N. Raines, Oscar C. Carr, III, Jonathan C. Hancock, Memphis, for Appellant, Hoops, L.P.

Paul G. Summers, Attorney General and Reporter, Michael E. Moore, Solicitor General, Janet M. Kleinfelter, Nashville, for Appellant, State of Tennessee.

Lyle Reid, John Knox Walkup, Thomas R. Dyer, Stephen J. Zralek, Memphis, for Amicus Curiae, Memphis Chamber of Commerce.

Duncan E. Ragsdale, Memphis, for Appellees.

## OPINION

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY KIRBY LILLARD, J., joined.

Two taxpayers sued the county, city, and a professional basketball franchise seeking a declaratory judgment that the actions of the city and county to procure and provide financing for a new arena and the agreements made in connection therewith, all in an effort to relocate the franchise to Memphis, violates art. II, § 29 of the Tennessee Constitution because it constitutes a giving or lending of credit of the city and county to a private entity and that the proposed expenditures are not for a public purpose. Defendants filed a motion, pursuant to Tenn.R.Civ.P. 12.02(6), to dismiss the complaint for failure to state a claim or cause of action upon which relief can be granted and also contested standing of the plaintiffs to maintain the action. The trial court denied the motion to dismiss and declared that the expenditures financed by the city and county were not for a public purpose and that the expenditures were in violation of art. II, § 29 of the Tennessee Constitution requiring a referendum election. The trial court enjoined defendants from proceeding further with the plans and agreements for the relocation and the proposed furnishing of expenditures in connection therewith. Defendants have appealed. We affirm in part, reverse and remand.

The parties to this appeal are plaintiffs, Duncan E. Ragsdale and Diane M. Rags-

dale (hereinafter Ragsdale or Plaintiffs) and Defendants, City of Memphis (hereinafter City), County of Shelby (hereinafter County), and Hoops, L.P. (hereinafter Hoops). Also, the State of Tennessee has filed a brief in defense of Ragsdale's assertion that the chancery court erred in failing to hold that the public purpose exception, as articulated in Tennessee case law, is a violation of the Tennessee Constitution and should be overturned.[1]

The original complaint, filed April 12, 2001, alleges that "[t]hese defendants are negotiating to enter a contract or contracts which will require the creation of municipal ordinance, county ordinance, and/or acts of the legislature of the State of Tennessee for the purpose of funding said contract with public tax funds." Plaintiffs allege that they are owners of real property located in the City of Memphis, County of Shelby, State of Tennessee, and that they are taxpayers. Plaintiffs allege that the contemplated or existing contracts violate the provisions of art. XI, § 8 of the Tennessee Constitution. Plaintiffs pray that the court declare the resolutions, ordinances, contracts, and agreements in violation of the Tennessee Constitution and for an injunction prohibiting appropriation of funds and other relief.

On April 17, 2001, Plaintiffs filed an amendment to the complaint which in essence asserts a class action and names numerous other defendants, including individual members of the Shelby County Commissioners, individual members of the Memphis City Council, state senators, and state representatives.

1. Plaintiffs' complaint in this case consists of the original complaint and four amendments thereto. In these pleadings, Plaintiffs have named numerous individuals and entities, including the State of Tennessee, as party de-

fendants, all of whom have now been dismissed by order of court. Therefore, only the defendants set out above are parties to this appeal.

On May 11, 2001, Plaintiffs filed a second amendment to the complaint which alleges that the contemplated or existing contracts and agreements to which the City, County, and State may be parties, violate the provisions of art. II, § 29 of the Tennessee Constitution, because it will constitute both the City and County giving or lending their credit to persons, companies, or associations without election, as required by this section of the Tennessee Constitution. The amendment further avers that any such ordinances or undertakings on the part of the City of Memphis will be in violation of § 835 of the City of Memphis Charter. Plaintiffs further aver that said agreements and contracts violate art. I, § 22 of the Tennessee Constitution in that they have or will create a monopoly. Plaintiffs further aver that the said agreements and contracts violate the provisions of art. II, § 31 of the Tennessee Constitution. It is further averred that the County of Shelby will be in violation of § 1.01 of the Charter of Shelby County, Tennessee. Plaintiffs again seek injunctive relief and a declaration that the various resolutions, ordinances, contracts, and agreements violate the Tennessee Constitution.

Defendants filed a Tenn.R.Civ.P. 12.02(6) motion to dismiss the complaints as amended by the first and second amendment for failure to state a claim upon which relief can be granted. On June 13, 2001, the court denied the defendants' motions to dismiss with leave to refile the motions after Plaintiffs amended their complaint by affixing as exhibits thereto the actual resolutions adopted and the actual contracts executed.

On June 22, 2001, Plaintiffs filed a third amendment to the complaint which seeks relief essentially upon the constitutional grounds previously alleged and attached as exhibits to the amendment the resolutions and documents setting forth the obligations and agreements of the parties. Defendants again filed a motion to dismiss for failure to state a claim upon which relief can be granted. The State also filed a motion to dismiss, asserting that Plaintiffs lacked standing to challenge the constitutionality of the rental car tax legislation.

On July 10, 2001, Plaintiffs filed a fourth amendment to the complaint, attaching as exhibits the county commission resolution for the Memphis Arena Project agreement and the nonrelocation agreement. The amendment avers that the action of the county as memorialized in the exhibit violates the provisions of art. II, § 29 of the Tennessee Constitution. The amendment further avers that the county's lending of credit to Hoops, L.P., and becoming a stockholder with Hoops, L.P. has no public purpose. The complaint further attaches as exhibits the documents executed by the City of Memphis, the Memphis Arena Use and Operating Agreement, the Pyramid License Agreement, the Memphis Arena Project Agreement, and the Nonrelocation Agreement. The amendment also avers that the actions of the City of Memphis set out in the agreement violate provisions of art. II, § 29 of the Tennessee Constitution and further avers that this action to lend the City's credit to Hoops, L.P. and to become a stockholder with Hoops, L.P. has no public purpose. The amendment further alleges that the Memphis Arena Use and Operating Agreement, the Pyramid License Agreement, the Memphis Arena Project Agreement and all of the resolutions of the City of Memphis taken together violate § 835 of the City of Memphis Charter, because they amount to a lease which is not a profitable lease. The amendment seeks a declaration voiding all of the resolutions and agreements as in violation of constitutional, statutory, and ordinance provisions.

A hearing for argument on Defendants' motions was held July 9, 2001. On July 11, 2001, the trial court entered a declaratory judgment, denied the motions to dismiss, and issued its injunction. The judgment declared that the financing arrangement for the construction of the new NBA arena was unconstitutional as violating art. II, § 29 of the Tennessee Constitution. The court found that the proposed arena was not being built or used for a public purpose and that the City and County were enjoined from expending City and County funds for the construction of the arena without an election, as required by art. II, § 29 of the Tennessee Constitution. The court also dismissed Plaintiffs' constitutional challenge to the car rental tax legislation passed by the Tennessee legislature.[2]

Defendants have appealed and present three issues for review which, as stated in their brief, are:

I. Whether the financing agreement between Memphis and Shelby County and the Sports Authority constitutes a lending of credit by the City of Memphis or Shelby County in violation of Article II, Section 29 of the Tennessee Constitution?

II. Whether the Chancellor improperly substituted his judgment for the decisions of the City and County, where the City and County found the construction and use of a multipurpose arena—a necessary precondition to attract an NBA team to Memphis—is a proper public purpose with Article II, Section 29 of the Tennessee Constitution?

III. Whether Plaintiffs, alleging no more than that they are taxpayers and owners of real property located in the City of Memphis and Shelby County, Tennessee, have standing to challenge

the financing agreement to build an area in Memphis for an NBA Franchise.

After entry of the trial court's declaratory judgment, Plaintiffs filed a motion to alter or amend the declaratory judgment by adding: (1) that the public purpose doctrine as an exception to art. II, § 29 of the Tennessee Constitution was overruled implicitly by the Supreme Court's decision in *Cleveland Surgery Ctr., L.P. v. Bradley County Mem'l Hosp.*, 30 S.W.3d 278 (Tenn.2000). Plaintiffs also sought a ruling that the Tennessee Sports Authority Act is unconstitutional. This part of the motion was withdrawn prior to a hearing on the motion.

This Court remanded the case to the trial court for the purpose of hearing Plaintiffs' motion to alter or amend, and after that hearing the trial court entered its order on July 20, 2001, denying Plaintiffs' motion to alter or amend stating, *inter alia,* "that *Cleveland Surgery Center* does not expressly or implicitly overrule any prior Tennessee cases."

In addition to the other issues presented, Plaintiffs present as an issue for review whether the trial court erred in denying the motion to alter or amend.

Initially, we should put the posture of this case in proper perspective for our consideration. Defendants filed Tenn. R.Civ.P. 12.02(6) motions to dismiss the complaint, as amended, for failure to state a claim upon which relief can be granted. The trial court denied the motions initially with leave to Defendants to file renewed motions after further complaint amendments. Defendants again filed motions to dismiss. The case was set for a hearing with specific instructions by the court that no testimony would be introduced.

2. Plaintiffs did not appeal this issue.

A motion to dismiss for failure to state a claim upon which relief can be granted tests the sufficiency of the complaint, and the basis for the motion is that the allegations of the complaint taken as true are insufficient to state a claim as a matter of law. *Cook, By and Through Uithoven v. Spinnaker's of Rivergate, Inc.,* 878 S.W.2d 934 (Tenn.1994). Exhibits attached to the complaint are a part of the pleading for all purposes. Tenn.R.Civ.P. 10.03. In ruling on a motion to dismiss for failure to state a claim, the court must construe the complaint in favor of the plaintiff and accept all allegations of fact as true. *Doe v. Sundquist,* 2 S.W.3d 919 (Tenn.1999). Inferences drawn from the facts or legal conclusions set out in the complaint are not required to be taken as true. *Riggs v. Burson,* 941 S.W.2d 44 (Tenn.1997); *Dobbs v. Guenther,* 846 S.W.2d 270, 273 (Tenn.Ct.App.1992).

In *Riggs,* the Supreme Court noted that plaintiffs' allegations that a statute violated constitutional provisions regarding due process and equal protection, and also violated the Tennessee Constitution were legal conclusions that are not taken as true. *Id.* at 48.

In the instant case, Plaintiffs' cause of action is premised on the alleged illegality and unconstitutionality of the resolution of the governing bodies and the contracts executed pursuant thereto. The construction of statutes and their application to the facts of the case is an issue of law and the appellate standard of review is de novo on the record without any presumption of correctness as to the trial court's conclusions of law. *Lavin v. Jordon,* 16 S.W.3d 362 (Tenn.2000). Interpretation of the agreements attached to the complaint is governed by the same rule, i.e., interpretation of written agreements is a matter of law, not of fact, and therefore the scope of review is de novo on the record with no presumption of correctness of the trial court's conclusions of law. *Rainey v. Stansell,* 836 S.W.2d 117 (Tenn. Ct.App.1992). According to the above authorities, this case comes to this Court to be considered de novo on the record with no presumption of correctness of the trial court's conclusions of law.

We will first consider Defendants' third issue for review, "whether the plaintiffs have standing to maintain this action." A citizen's standing to sue a governmental entity is a threshold issue that should be resolved before addressing the merits of the case. *See Phillips v. County of Anderson,* No. E2000–01204–COA–R3–CV, 2001 WL 456065 (Tenn.Ct.App., April 30, 2001). In *Cobb v. Shelby County Bd. of Comm'rs.,* 771 S.W.2d 124 (Tenn.1989) the Court said:

> Because citizens' suits do burden the conduct of public affairs, a defendant entity or officer should not be obliged to defend on the merits if he is entitled to a dismissal for lack of standing. Nor should the court critique the conduct of public officials if the cause is not justiciable.

*Id.* at 125.

In order for Plaintiffs to have standing to challenge the legality of the expenditure of public funds, the Plaintiffs must satisfy three requirements: (1) taxpayer status; (2) an allegation of a specific illegality in the expenditure of public funds; and (3) prior demand. *See Phillips,* 2001 WL 456065 at *4 (citing *Cobb,* 771 S.W.2d at 126).

In *Badgett v. Rogers,* 222 Tenn. 374, 436 S.W.2d 292 (Tenn.1969), our Supreme Court stated that citizens are generally not permitted to interfere with or restrain direct official acts when the citizens fail to allege and prove damages to themselves different in character from those sustained

by the public at large, but the Court also noted an exception to the general rule, "where it is asserted that the assessment or levy of a tax is illegal, or that public funds are misused or unlawfully diverted from stated purposes." *Id.* at 294. In the case at bar, Plaintiffs have alleged the misuse or diversion of public funds.

■ Although the trial court in the instant case recognized that no prior demand had been made to rectify the situation, such a demand is excused as a futile gesture. The *Badgett* Court noted that the general rule requires a prior demand, but stated: "[h]ere, again, exception arises, and such demand is excused where the status and relation of the involved officials to the transaction in question is such that any demand would be a formality." *Id.* at 295 (citations omitted). In the instant case, the executives of both City and County have actively participated in the negotiations involving the NBA franchise, have signed required legislation, and have ultimately signed the required contractual documents. Under these circumstances, a prior demand would be a mere formality and should be excused.

Therefore, based on the record before us, we do not find that the chancellor erred in finding that the Plaintiffs have standing to file this action.

We will now consider Defendants' first issue for review:

I. Whether the financing agreement between Memphis and Shelby County and the Sports Authority constitutes a lending of credit by the City of Memphis or Shelby County in violation of art. II, § 29 of the Tennessee Constitution?

The trial court's declaratory judgment states as pertains to this issue:

4. The executed Memphis Arena Use and Operating Agreement and Memphis Arena Project Agreement, as presently crafted, violate art. II, § 29 of the Tennessee State Constitution to the extent that they give aid and lends the credit of the City and County in aid of Hoops, L.P., a private (for profit) business partnership.

5. The duly passed resolutions of the Memphis City Council and Shelby County Commission appropriating any sums of money or extension of credit, other than that which is regularly expended for any normal project under construction, is void to the extent that said monies or credit will be used for the construction of the "new arena" as presently proposed.

Defendants assert that the legislative actions of the City and County are not in violation of art. II, § 29, of the Tennessee Constitution because neither the City nor Shelby County is lending its credit for the construction of the arena; nor does the City's and County's agreement to replenish the debt service reserve constitute a lending of credit in violation of the Tennessee Constitution.

Art. II, § 29 of the Tennessee Constitution provides in pertinent part:

**Sec. 29. Counties and towns—Power to tax—Credit.**—The General Assembly shall have power to authorize the several counties and incorporated towns in this State, to impose taxes for County and Corporation purposes respectively, in such manner as shall be prescribed by law; and all property shall be taxed according to its value, upon the principles established in regard to State taxation. But the credit of no County, City, or Town shall be given or loaned to or in aid of any person, company, association or corporation, except upon an election to be first held by the qualified voters of such county, city or town, and the assent of three-fourths of the votes cast at said election. Nor shall any county, city or

town become a stockholder with others in any company, association or corporation except upon a like election, and the assent of a like majority.

In *Martin v. Beer Bd. for City of Dickson*, 908 S.W.2d 941 (Tenn.Ct.App.1995), this Court, in an opinion written by Judge Koch, succinctly describes the role of the Court in interpreting constitutional provisions:

> State constitutions embody fundamental values and articulate the citizens' common aspirations for constitutional governance and the rule of law. Rather than stating inflexible specific rules of conduct, they contain broad principles capable of accommodating societal changes. *Cumberland Capital Corp. v. Patty*, 556 S.W.2d 516, 530 (Tenn.1977). Constitutional provisions gather meaning from the experience of the people. *National Mut. Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 646, 69 S.Ct. 1173, 1195, 93 L.Ed. 1556 (1949) (Frankfurter, J., dissenting). The courts should expect that modern society will mold and shape constitutional principles into new and useful forms.

> The courts are society's chief expositors of constitutional principles. *Metropolitan Gov't v. Tennessee State Bd. of Equalization*, 817 S.W.2d 953, 955 (Tenn.1991); *LaFever v. Ware*, 211 Tenn. 393, 400, 365 S.W.2d 44, 47 (1963). Since constitutions derive their power and authority from the people, *The Judges' Cases*, 102 Tenn. 509, 520, 53 S.W. 134, 136 (1899); *Stratton Claimants v. Morris Claimants*, 89 Tenn. 497, 512–13, 15 S.W. 87, 90 (1891), our articulation of constitutional principles must capture the intentions of the persons who ratified the constitution. These intentions are reflected in the words of the constitution itself, *Hatcher v. Bell*, 521 S.W.2d 799, 803 (Tenn.1974); *Shelby*

*County v. Hale*, 200 Tenn. 503, 510, 292 S.W.2d 745, 748 (1956), rather than our own subjective notions of unexpressed constitutional intent. *Luehrman v. Taxing Dist.*, 70 Tenn. 425, 438 (1879).

> The courts must construe constitutional provisions reasonably, *Ashe v. Leech*, 653 S.W.2d 398, 401 (Tenn.1983), in light of the practices and usages that were well-known when the provision was ratified. *Peay v. Nolan*, 157 Tenn. 222, 230, 7 S.W.2d 815, 817 (1928). We must give the words used in a constitution their usual and ordinary meaning unless the context requires otherwise. *Gaskin v. Collins*, 661 S.W.2d 865, 867 (Tenn. 1983). We must also consider these terms with reference to what the people who ratified the provision thought they meant. *State ex rel. Doyle v. Torrence*, 203 Tenn. 175, 182, 310 S.W.2d 425, 427–28 (1958).

*Martin*, 908 S.W.2d at 946–47.

In *Cleveland Surgery Ctr., L.P. v. Bradley County Mem'l Hosp.*, 30 S.W.3d 278 (Tenn.2000), plaintiffs, healthcare providers, filed a declaratory judgment suit against a county hospital, private developers, and a physicians' organization, challenging the constitutionality of the hospital's ties to the private developer's adjoining office building and the physicians' organization. The plaintiffs alleged that the defendants were violating art. II, § 29 of the Tennessee Constitution which precludes any county, city, or town from either giving or loaning its credit to any private person or private business or becoming a stockholder with others in a private company unless an election is held as provided for in the constitutional provision. The defendant, Bradley County Memorial Hospital, is a *quasi*-governmental entity without taxing power created by the general assembly in 1947 to provide health care services to residents

of Bradley County and the surrounding area. The issue before the court was whether the terms "county, city, or town" set out in the constitutional provision encompasses a *quasi*-governmental entity, such as Bradley Memorial. In arriving at its decision, the Court extensively discussed the historical background of similar constitutional provisions and, in particular for this part of the country, stated:

> Adoption of constitutional provisions restricting the extension of public credit did not become prevalent in the South until after the Civil War. [Stewart E. Sterk & Elizabeth S. Goldman, *Controlling Legislative Shortsightedness Debt Limitations*, 1991 Wis. L.Rev. 1301, 1311]. As a result of the Civil War, most infrastructure in the South had been destroyed including railroads, roadways, canals, and bridges. *Id.* at 1310. To rebuild the infrastructure, southern states borrowed money and authorized large bond issues. *Id.* at 1311. In addition, Reconstruction governments in the South were said to have incurred debt and authorized bond issues for personal gain. *Id.* When the period of Reconstruction ended, many southern states adopted constitutional provisions limiting the extension of public credit. *Id.* Tennessee is a clear example of this trend. Prior to 1870, Art. II, § 29 consisted of only one sentence, which is currently the first sentence of the section. *See Eye Clinic*, 986 S.W.2d at 570. The second and third sentences of the provision, which are at issue in this appeal, were adopted as part of the Constitution of 1870 at the end of the Reconstruction government in Tennessee and were aimed at ending the abuses that occurred during Reconstruction. As one author explained:

> > On the subject of using the State's credit to aid railroads, turnpikes and other 'internal improvements,' the [1870] Constitution made important changes. Here was to be seen a strong reaction against the abuses of the Brownlow Administration which was in power from 1865 to 1869. There was also evidence of a general *laissez-faire* spirit, which was more prevalent at this time than during the framing of the First and Second Constitutions.

> > The effects of the provisions were: (1) the State might not thereafter own banks in whole or in part, nor invest in the capital stock of private banks or other private companies, as had been frequently done before; (2) the political subdivisions were not absolutely forbidden to use their credit in aid of private enterprises, but the three-fourths vote required for this action was a powerful limitation; (3) railroads which previously had been loaned State bonds and were in default on the payments which were supposed to provide the State with funds to pay the interest and retire the principal of such bonds, could no longer expect the State to continue to refund such bonds at maturity, but might instead expect seizure and sale by the State.

> James E. Thorogood, *A Financial History of Tennessee Since 1870* 19–20 (1940) (citation omitted).

*Cleveland Surgery Ctr., L.P.*, 30 S.W.3d at 283–84. The Court, after considering the historical background, the origin of the constitutional provision, and the concerns which prompted the adoption of the constitutional provision stated that the terms "county, city, or town" should be given their ordinary and inherent meaning. The Court said:

In our view, the Western Section Court of Appeals correctly interpreted these terms in *Eye Clinic* as follows:

> The language of Section 29 suggests that the drafters intended that the phrase, "county, city or town," be confined to its literal meaning. The first sentence of Section 29 empowers the General Assembly to authorize counties and towns to impose taxes. The second sentence limits the ability of cities, counties, and towns to lend credit. The second sentence begins with the word, "but." The third sentence, prohibiting such cities, counties, and towns from co-owning stock, begins with the word, "nor." *Considering these three sentences together, the limitations in the second and third sentences plainly modify the entities described in the first sentence.*

986 S.W.2d at 571. (emphasis added).

*Id.* at 284.

The Court concluded that the terms, county, city or town, "encompass only those entities to which the General Assembly may delegate taxing authority pursuant to the first sentence of the constitutional provision." *Id.*

As noted in our discussion of *Cleveland Surgery Ctr., L.P.,* this Court in *Eye Clinic, P.C. v. Jackson–Madison County Gen. Hosp.,* 986 S.W.2d 565 (Tenn.Ct.App.1998) determined that "county, city, or town," as referred to Art. II, Sec. 29 of the Tennessee Constitution does not encompass agencies and instrumentalities of municipalities, but only includes those entities to which the General Assembly may delegate taxing authority pursuant to the first sentence of the constitutional provision.

Pursuant to the provisions of T.C.A. § 7–67–104 (1998), municipalities, including counties, are authorized to allow the formation, by appropriate resolution, of the incorporation of sports authorities.

The statute is part of the Sport Authorities Act of 1993, T.C.A. § 7–67–101—122 (1998 and Supp.2000). The Act's purposes are set out in T.C.A. § 7–67–102:

**Legislative findings—Purpose of chapter—Liberal construction.**

(a) It is hereby found and determined that:

(1) There is an immediate need to promote and further develop recreational opportunities in this state by facilitating and equipping the acquisition, construction, and rehabilitation of sports complexes, stadiums, arenas and other recreational facilities for the holding of professional and amateur athletic events;

(2) The development of such facilities will provide a means to attract and locate major professional team franchises in the state, will enhance the state's image as a sports center, and will encourage and foster economic development and prosperity;

(3) An authority is needed in individual communities to prepare comprehensive, long-range master plans for the orderly development of sports and recreational facilities and to promote sports and sports-related activities; and

(4) In many instances, effective cooperation between various units of government has been hampered because of inadequate statutory authority therefor.

(b) It is the purpose of this chapter to address these findings by providing for the establishment of sports authorities to plan, promote, finance, construct, acquire, renovate, equip and enlarge buildings, sports complexes, stadiums, arenas, structures and facilities for public participation and enjoyment of professional and amateur sports, fitness, health and recreational activities. The primary purpose of any and all such

facilities shall be the conduct of sports events, but use of these facilities need not be limited to those events.

(c) This chapter shall be liberally construed in conformity with its purpose.

The City and County duly authorized the formation of the sports authority which has now been incorporated pursuant to the Act. The corporation so formed is a public corporation. T.C.A. § 7–67–106. T.C.A. § 7–67–109 (Supp.2000) sets out the extensive powers of the authority and states specifically:

> Each sports authority created pursuant to this chapter shall be a public nonprofit corporation and a public instrumentality of the municipality with respect to which the authority is organized.

The sports authority is authorized to obtain revenue, *inter alia*, by issuing bonds. T.C.A. § 7–67–109—112 (Supp. 2000). The financial authority and responsibilities of the City and County are provided for in the Act by T.C.A. § 7–67–115 and § 7–67–116:

### 7–67–115. Nonliability of municipality.

—Except to the extent of any revenues which may be specifically allocated, transferred, contributed or pledged by a municipality in accordance with the provisions of this chapter and laws, rules and regulations applicable thereto, no municipality shall in any event be liable for the payment of the principal of or interest on any bonds of the authority or for the performance of any pledge, mortgage, obligation or agreement of any kind whatsoever which may be undertaken by the authority, and none of the bonds of the authority or any of its agreements or obligations shall be construed to constitute an indebtedness of the municipality within the meaning of any constitutional or statutory provision whatsoever.

### 7–67–116. Power of municipalities to aid or assist authorities.

—(a) Except as may be expressly prohibited hereby, any municipality is authorized to aid or otherwise provide assistance to an authority created pursuant to the provisions of this chapter by such municipality, including entering into leases of projects or parts thereof with an authority, for such term or terms and upon such conditions as may be determined by the governing body of such municipality, notwithstanding and without regard to the restrictions, prohibitions, or requirements of any other law, whether public or private, or granting, contributing and/or pledging revenues of the municipality to or for the benefit of the authority derived from any source (except revenues derived from ad valorem property taxes which shall not be granted, contributed or pledged by the municipality in payment of or collateral for any revenue bonds of the authority).

(b) In addition to the powers granted in this chapter, any metropolitan government or legislative bodies of municipalities, acting jointly, in any county having a population in excess of eight hundred thousand (800,000), according to the 1990 federal census or any subsequent federal census, is authorized to aid or otherwise provide assistance to an authority created pursuant to the provisions of this chapter by such metropolitan government or municipalities, acting jointly, in any county having a population in excess of eight hundred thousand (800,000), according to the 1990 federal census or any subsequent federal census, by entering into contracts with any other party in furtherance of the purposes of this chapter, for such term or terms and upon such conditions as may be determined by the governing body of such metropolitan government or legis-

lative bodies of municipalities, acting jointly, in any county having a population in excess of eight hundred thousand (800,000), according to the 1990 federal census or any subsequent federal census

■ The resolutions of both the City and the County, authorizing the execution of the necessary legal documents to accomplish the building, use, and operation of the arena and related matters, explicitly provide that no *ad-valorem* tax revenue would be used to pay any debt service on the bonds. Those bonds are clearly issued by the sports authority and not by either of the governmental entities. The resolutions appear to comply with the statutory requirements of the Sports Authority Act of 1993. Since the bonds are not issued by governmental entities and are not backed or secured by the unlimited taxing authority of the entities, such entities are not giving or lending their credit to a private person or private business.

We should also note that it is undisputed that the record before us does not in any way indicate that the governmental entities are involved as a stockholder with others in a private company and thus that part of the constitutional provision is not involved in this controversy.

The trial court also found that the contribution by the City and County of twelve million dollars each to the proposed project and the agreement by the governmental entities to restore any deficits in the sports authority debt service reserve fund constitutes a lending of the governmental entities' credit as prohibited by the constitutional provisions without the necessary public referendum. The trial court also found that the contingency payment by the City and County if the proposed arena is not substantially completed by the beginning by the 2003–2004 NBA season constitutes a lending of credit by the City and County within the meaning of the constitu-

tional provision. The record reflects that the City's twelve million dollar pledge is met through the allocation of excess hotel/motel tax revenue, and that the County's twelve million dollar pledge comes from funds that the County has accumulated. We note first that T.C.A. § 7–67–115, part of the Sports Authority Act, specifically authorizes the governmental entities to aid the sports authority in its financial endeavors.

Tennessee courts have considered what is meant by the prohibitory language of lending credit set out in art. II, § 29 of the Tennessee Constitution. In *Copley v. County of Fentress,* 490 S.W.2d 164 (Tenn. Ct.App.1972), a suit was filed to enjoin the county from constructing an industrial building for use by private industry pursuant to a resolution of the county court. The complainants asserted, among other things, that the county could not advance the funds for construction of the building as violative of art. II, § 29 of the Tennessee Constitution, because it results in credit of the county being given or loaned to or in aid of a private corporation without approval of the voters, as required by the constitutional provision. The Court noted that the county had accumulated funds which were to be used for the construction of the building and that the county was issuing no bonds or other obligations for borrowing money for such construction purposes. The Court further noted that the dictionary definition of the word "credit" only applies to obligations due and to become due. The Court discussed cases from Florida and Idaho, two states that have constitutional provisions similar to Tennessee:

In *Nohrr v. Brevard County Educational Fac. Authority* (1971), 247 So.2d 304, the Supreme Court of Florida considered this precise question in construing Article VII, Section 10 of the

Florida Constitution, which contains the following provision:

'Neither the state nor any county, school district, municipality, special district, or agency of any of them, shall become a joint owner with, or stockholder of, or give, lend or use its taxing power or credit to aid any corporation, association, partnership or person....' Supra, p. 308.

In that case, the Florida Court said: 'The word "credit", as used in Fla. Const., art. VII, § 10 (1968) implies the imposition of some new financial liability upon the State or a political subdivision which in effect results in the creation of a State or political subdivision debt for the benefit of private enterprises.' (Supra, p. 309).

In *Engelking v. Investment Board* (1969), 93 Idaho 217, 458 P.2d 213, the Supreme Court of Idaho also considered the same question in construing Article VIII, Section 2 of the Idaho Constitution, which contains the following provision:

'The credit of the state shall not, in any manner, be given, or loaned to, or in aid of any individual, association, municipality or corporation; nor shall the state directly or indirectly, become a stockholder in any association or corporation....' (Supra, p. 216).

In that case, the Idaho Court said: 'The word "credit" as used in this provision implies the imposition of some new financial liability upon the State which in effect results in the creation of State debt for the benefit of private enterprises. This was the evil intended to be remedied by Idaho Const. art. 8, § 2, and similar provisions in other state constitutions.' (Supra, p. 218).

*Copley,* 490 S.W.2d at 169.

The Court adopted the reasoning of both courts, stating:

Therefore, we adopt the reasoning of the Florida and Idaho Courts and hold that the word 'credit', as used in Article II Section 29 of the Tennessee Constitution implies the imposition of some new financial liability upon a county, city or town which in effect results in creation of a public debt for the benefit of private enterprises and this was the evil intended to be prevented by said constitutional provision.

It necessarily follows, therefore, that it was not necessary for any election to be held for the purpose of obtaining approval of the voters for the construction of the building in question here.

*Id.* at 169.

In *State ex rel. Bigham v. Powers,* 124 Tenn. 553, 137 S.W. 1110 (1911), a mandamus suit was filed against a county judge to require the payment of certain preliminary expenses incurred in connection with the formation of a drainage district. The county judge demurred to the bill and challenged the constitutionality of the legislative act authorizing the process on the ground that making such payment would be in violation of art. II, § 29 of the Tennessee Constitution prohibiting the giving or lending of aid to private persons without an election as required by the constitutional provision. The Supreme Court of Tennessee held that the act conferring authority upon the counties to appropriate a portion of the general fund did not make a case for lending the credit of the county as prohibited by art. II, § 29 of the Tennessee Constitution. *Id.* at 1114.

In *Fort Sanders Presbyterian Hosp. v. Health and Educ. Facilities Bd.,* 224 Tenn. 240, 453 S.W.2d 771 (1970), plaintiff, Fort Sanders Hospital, a nonprofit corporation, filed a declaratory judgment action against the defendant, Health and Edu-

cational Facilities Board of the County of Knox and others. Plaintiff sought a declaration of the rights of plaintiff to specific performance of certain contracts with defendant pursuant to Chapter 333, Public Acts of 1969, and to have the chapter declared valid and constitutional. The defendant demurred to the bill contending that the agreements were invalid because Chapter 333 was an unconstitutional enactment. Although the Court considered a number of issues, the issue pertinent to the case before this Court is the assertion that the Act in question provides for the lending of the credit of a municipality to a corporation without a public referendum as required by art. II, § 29 of the Tennessee Constitution. The Act in question provides for the formation of a corporation by the governing body. The corporation is authorized to issue bonds for necessary funds to provide the facilities set out in the Act. The Act specifically provided, similarly to the Sports Authority Act in the case before us, that the bonds of the corporation could not be construed to constitute an indebtedness of the municipality within the meaning of any constitutional or statutory provision. It was argued, however, that the act of the municipality in procuring the bond issue is equivalent to a lending of its credit. In this regard, the Court stated:

> As stated earlier in this opinion, the Board is but an arm or instrumentality of Knox County. The property in question, hospital facilities, is to be held by the Board for a public purpose. This property, under the agreement made between the Board and these complainants, is to be mortgaged to secure the bond issue, the proceeds of which will be used to build and equip facilities which the Board, in turn, will lease to the private corporations.

> Thus, this mortgaging of public property is not the equivalent of the municipality lending its credit to complainants. *Id.* at 775.

Any aid given by the City and County is given to the Sports Authority, which is a public corporation. T.C.A. § 7-67-106 (1998). The governmental entities are authorized by the Sports Authority Act to contribute pledged revenues to or for the benefit of the Sports Authority, except revenues from *ad-valorem* property taxes. T.C.A. § 7-67-116(a) (1998).

In view of the established authorities in this state set out above, the advancement of funds by the City and County for the purposes heretofore set out does not constitute the giving or lending of credit of the City and County within the contemplation of art. II, § 29 of the Tennessee Constitution. Our courts have made it clear that lending of credit involves more than the advancement of accumulated funds, since it does not result in the creation of a future indebtedness. Such aid by the governmental entities goes directly to a public corporation. We must bear in mind that there is no constitutional attack on the Sports Authority Act, and the record establishes that the actions of the City and County are in compliance with the Act.

We will now consider Defendants' second issue for review:

II. Whether the Chancellor improperly substituted his judgment for the decisions of the City and County, where the City and County found the construction and use of a multipurpose arena—a necessary precondition to attract an NBA team to Memphis—is a proper public purpose within Article II, Section 29 of the Tennessee Constitution?

Defendants assert that the chancellor, notwithstanding the legislation adopted by the City and County, focused his decision

on what he considered as a dis-advantageous contractual arrangement. The chancellor's opinion indicates that he placed much emphasis on the business aspect, concluding that the construction of the arena was not for a public purpose. The public purpose criterion, or exception, as it has been called, has been recognized in this state since 1896, when the Tennessee Supreme Court held that an appropriation of $25,000.00 of county revenue to provide private citizens an exhibit at the Tennessee Centennial International Exposition did not constitute a lending of the county's credit within the constitutional prohibition. In *West v. Tennessee Hous. Dev. Agency*, 512 S.W.2d 275 (Tenn.1974), the Supreme Court, in considering the constitutional attack on state legislation premised on art. II, § 31 of the Tennessee Constitution stated:

"Again it appears that the provisions of Article 2, § 31, have been qualified by the 'public purpose' criterion. The question was authoritatively dealt with by our *Supreme Court in Bedford County Hospital v. Browning*, 189 Tenn. 227, 225 S.W.2d 41 (1949), where the Court concluded that the giving of the state's credit for non-public purposes only is prohibited by Article 2, § 31. Discussing this section the Court noted as follows:

" 'The obvious purpose of this Section of our Constitution was to prevent the State from using its credit as a gratuity or donation to any person, corporation or municipality. It is further obvious that it was not designed to prevent the State from using its credit to aid persons, corporations, or municipalities if required to accomplish a State or public purpose, or to fulfill a State duty or obligation under its police power. Under the authorization, the Legislature and not the courts is the exclusive judge of the

manner, means, agencies and methods to meet and fulfill these purposes.' 189 Tenn. at 32 [225 S.W.2d 41]."

*West*, 512 S.W.2d at 283–84.

In *Chattanooga–Hamilton County Hosp. Auth. v. City of Chattanooga*, 580 S.W.2d 322 (Tenn.1979), our Supreme Court noted the application of the public purpose criterion to art. II, § 29 of the Tennessee Constitution, stating:

Likewise, the prohibition relative to the extension of credit by a city or county to or in aid of any company, association or corporation under article II, § 29 must be qualified by the "public purpose" criterion. *Cf. West v. Tennessee Hous. Dev. Agency, supra*, 512 S.W.2d at 283.

*Id.* at 329.

Although it is clear from the authorities that the public purpose exception or criterion has long been recognized in this state, controversy arises in making a determination of the existence of a public purpose. In the instant case, the chancellor determined that the building of the arena was not for a public purpose. His opinion indicates that this finding is based on the contractual terms which the chancellor observed as benefitting the NBA franchise more than the citizens of the City and County.

We have previously noted that the acts of the City and County are in conformity with the Sports Authority Act. The Act, as previously noted, sets out in detail the purpose of the chapter and the liberal construction to be given thereto. The public purpose doctrine or criterion as an exception to art. II, § 29 of the Tennessee Constitution was a fully established doctrine at the time the Sports Authority Act was passed and, of course, the provisions of the Constitution are well known. The legislature is presumed to know the existing state of the law when it enacts

new legislation. *See Lavin v. Jordon,* 16 S.W.3d 362 (Tenn.2000); *Blankenship v. Estate of Bain,* 5 S.W.3d 647 (Tenn.1999). There is every indication that the legislature intended for activities encompassed by the Sports Authority Act to be identified as a public purpose. Courts are not authorized to consider whether legislation is unwise or inequitable; thus, we cannot consider the wisdom or necessity of the legislature's policy decisions. *See Baldwin v. Knight,* 569 S.W.2d 450, 452 (Tenn. 1978).

In the instant case, both the state legislature, in its enactment of the Sports Authority Act, and the legislative bodies of Shelby County and the City of Memphis have determined that the erection and the use of the proposed sports arena serves a valid public purpose. These decisions of the legislative bodies are entitled to great deference. The court should not substitute its judgment for that of the legislative body. *McCallen v. City of Memphis,* 786 S.W.2d 633, 641 (Tenn. 1990). "Both legislative and administrative decisions are presumed to be valid." *Id.; see also Robertson County v. Browning–Ferris Industries of Tennessee, Inc.,* 799 S.W.2d 662, 667 (Tenn.Ct.App.1990).

The Eastern Section of this Court has considered the question of whether the operation of a sports stadium is a use for a public purpose. In *City of Chattanooga v. Classic Refinery, Inc.,* No. 03A01–9712–CV–00552, 1998 WL 881862 (Tenn.Ct.App., Dec. 17, 1998), a property owner appealed an order of a taking of its property adjacent to the Finley Stadium project in downtown Chattanooga in a condemnation proceeding. The court noted that in making a proper judicial determination in a condemnation case, the court must determine first whether the taking was for a public or private use and then make a determination of the necessity for the tak-

ing. Considering the question of public versus private use, the court said:

The first phase of a judicial analysis in a condemnation proceeding traditionally focuses on the issue of whether the proposed property will be used for a public purpose. *Heth,* 186 Tenn. at 326, 210 S.W.2d at 328; *Southern Ry. Co.,* 126 Tenn. at 281, 148 S.W. at 665; *Edmondson,* 931 S.W.2d at 934. In doing so, this Court affords great weight to a municipality's determination of public use. *Heth,* 186 Tenn. at 326, 210 S.W.2d at 328. The City and County have made it abundantly clear through their respective resolutions and their petition for taking that Finley Stadium does serve a public purpose. Additionally, we note that the Tennessee General Assembly has spoken in favor of the need for stadium construction and the designation of such construction as a public work. *See* T.C.A. 7–67–102; 9–21–101; 9–21–105(20)(A). This court is confident in its view that the purpose of Finley Stadium is for a public use. The stadium will undoubtedly enhance the community and its residents by providing a venue for sporting events, concerts, and the like. In fact, the stadium has already been used for such purposes.

*Id.* at *4.

Although, as the chancellor found, there will be some benefit accruing to the NBA franchise, if a public purpose is established, the fact that a private entity may receive some benefit from the legislation does not invalidate the established public purpose. *City of Chattanooga v. Harris,* 223 Tenn. 51, 442 S.W.2d 602 (1969), is a case in which a declaratory judgment was filed to determine the constitutionality of a statute requiring cities to furnish counsel for any policeman or fireman against whom suit is filed and to

indemnify the said policeman or fireman for any judgment rendered against them. The city contended that the legislation was unconstitutional because, *inter alia*, it violates the prohibition set forth in art. II, § 29 of the Tennessee Constitution. The Court noted that undoubtedly the individual policemen and firemen reaped some fringe benefits from such a legislation. In upholding the constitutionality of the act, the Court said:

> In applying Article II, Section 29, the first question must necessarily be whether the attempted action is designed to accomplish some public purpose, for, as noted in *McConnell v. City of Lebanon*, 203 Tenn. 498, 314 S.W.2d 12, in speaking of an attempted bond issue, if they are not for a public or corporate purpose they would be in violation of this section even if approved by more than three-fourths of the qualified voters.

> ＊ ＊ ＊

> The fact that the individual policeman and fireman do gain a benefit from the implementation of the statute does not deny that a public purpose is being served. This Court, in *Pack v Southern Bell Tel. & Tel. Co.*, supra [215 Tenn. 503, 387 S.W.2d 789 (1965)], noted that the test for whether or not the expenditure of funds is for public purpose is the end or total purpose, and the mere fact that some private interest may derive some incidental benefit from the activity does not deprive the activity of its public nature if its primary function is public.

*Id.*, 442 S.W.2d at 606.

The *Classic Refinery* Court is not alone in its determination that a sports arena is for public use. Numerous other states have reached the same conclusion. *See Peacock v. Shinn*, 139 N.C.App. 487, 533 S.E.2d 842 (2000) rev. denied, 353 N.C. 267, 546 S.E.2d 110 (2000); *Lifteau v. Met-*

*ro. Sports Facilities Comm'n.*, 270 N.W.2d 749 (Minn.1978); *Citizens For More Important Things v. King County*, 131 Wash.2d 411, 932 P.2d 135 (1997); *CLEAN v. Washington*, 130 Wash.2d 782, 928 P.2d 1054 (1996); *In Re Spectrum Arena, Inc.*, 330 F.Supp. 125 (E.D.Pa.1971); *Martin v. City of Philadelphia*, 420 Pa. 14, 215 A.2d 894 (1966); *Murphy v. Erie County*, 28 N.Y.2d 80, 320 N.Y.S.2d 29, 268 N.E.2d 771 (1971); *Libertarian Party v. Wisconsin*, 199 Wis.2d 790, 546 N.W.2d 424 (1996); *Ginsberg v. City and County of Denver*, 164 Colo. 572, 436 P.2d 685 (1968), and many other cases.

The beautifully phrased explanation of the ever evolving "public purpose" is found in *Conrad v. Pittsburgh*, 421 Pa. 492, 218 A.2d 906 (1966):

> The objective of a community is not merely to survive, but to progress, to go forward into an ever-increasing enjoyment of the blessings conferred by the rich resources of this nation under the benefaction of the Supreme Being for the benefit of all the people of that community.

> If a well governed city were to confine its governmental functions merely to the task of assuring survival, if it were to do nothing but provide 'basic services' for an animal survival, it would be a city without parks, swimming pools, zoo, baseball diamonds, football gridirons and playgrounds for children. Such a city would be a dreary city indeed. As man cannot live by bread alone, a city cannot endure on cement, asphalt and sewer pipes alone. A city must have a municipal spirit beyond its physical properties, it must be alive with an esprit de corps, its personality must be such that visitors—both business and tourist—are attracted to the city, pleased by it and wish to return to it. That personality must be one to which

the population contributes by mass participation in activities identified with that city.

*Id.* at 914 (Justice Musanno concurring).

Considering the record as a whole, we conclude that the resolutions of the governmental entities and the contracts executed pursuant thereto are for a public purpose as construed by the Tennessee court and the decisions of courts in the other states. However, this opinion should not be construed as approving the business decisions made by the governmental authorities as reflected in the executed agreements.

The last issue for review as presented by Plaintiffs is whether the trial court erred in overruling its motion to alter or amend the judgment. Plaintiffs filed a motion to alter or amend the judgment requesting the court to hold that the "public purpose exception," as articulated in Tennessee case law is a violation of art. II, § 29 and art. II, § 31 of the Tennessee Constitution and to overturn the doctrine. The trial court denied the motion to alter or amend. Plaintiffs have now, by this appeal, requested this Court to reverse the trial court on this issue which, in effect, would require this Court to overrule the decisions of our Supreme Court.

It is not the province of this Court to overrule a decision or decisions of the Supreme Court. The prerogative to change the law as the Plaintiffs seek in this case lies with the Supreme Court or the legislature. *See Lentz v. Baker,* 792 S.W.2d 71 (Tenn.Ct.App.1989), *Graves v. Anchor Wire Corp. of Tennessee,* 692 S.W.2d 420 (Tenn.Ct.App.1985).

In summary, the judgment of the trial court that Plaintiffs have standing to maintain this action is affirmed, and the judgment in all other respects is reversed. The injunction issued by the trial court is dissolved. The case is remanded to the trial court for such further proceedings as may be necessary. Costs of the appeal are assessed against the appellees.