IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2023

**THE METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY, ET AL. V. TENNESSEE DEPARTMENT OF EDUCATION, ET AL.**

**Appeal from the Chancery Court for Davidson County**
**No. 20-143-II, 20-242-II      Anne C. Martin, Chancellor[1]**

---

**No. M2022-01786-COA-R3-CV**

---

This appeal concerns a lawsuit challenging the Tennessee Education Savings Account Pilot Program, Tenn. Code Ann. § 49-6-2601, *et seq*. ("the ESA Act"). A group of parents and taxpayers from Davidson and Shelby Counties ("Plaintiffs") sued state officials ("State Defendants") in the Chancery Court for Davidson County ("the Trial Court"). In their operative amended complaint, Plaintiffs alleged that the ESA Act violates the Tennessee Constitution and state law by diverting taxpayer funds appropriated for public schools in Davidson and Shelby Counties to private schools, resulting in unique harm to these localities. A group of parents with children eligible for the ESA Act ("Bah Defendants") and another group ("Greater Praise Defendants") (all defendants collectively, "Defendants") intervened in defense of the ESA Act. Defendants filed motions to dismiss, which the Trial Court granted on grounds that Plaintiffs lack standing and their claims are not ripe for judicial review. In reaching its decision, the Trial Court found that the ESA Act has not caused the affected counties any unequal hardship. Plaintiffs appeal the dismissal of their first, second, and sixth causes of action only. We conclude that the Trial Court erred by deciding factual disputes over the impact of the ESA Act on Plaintiffs at the motion to dismiss stage. Plaintiffs alleged enough in their amended complaint to establish standing both as parents and taxpayers. Plaintiffs' claims also are ripe for judicial review. We, therefore, reverse the judgment of the Trial Court as to Plaintiffs' first, second, and sixth causes of action and remand for further proceedings consistent with this Opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed; Case Remanded**

---

[1] Pursuant to Tenn. Code Ann. § 20-18-101, the Tennessee Supreme Court appointed a three-judge panel to preside over this case, which involves constitutional challenges. The Trial Court panel was composed of Chancellor Anne C. Martin, Judge Tammy M. Harrington, and Judge Valerie L. Smith. Chancellor Martin served as chief judge of the panel.

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CARMA DENNIS MCGEE and JEFFREY USMAN, JJ., joined.

Christopher M. Wood, Nashville, Tennessee; Sophia Mire Hill, Jackson, Mississippi; Stella Yarbrough, Nashville, Tennessee; and Wendy Lecker and Jessica Levin, Newark, New Jersey, for the appellants, Roxanne McEwen, David P. Bichell, Terry Jo Bichell, Lisa Mingrone, Claudia Russell, Inez Williams, Heather Kenney, Elise McIntosh, and Apryle Young.

Justin Owen, Nashville, Tennessee; Arif Panju, Austin, Texas; and David Hodges and Keith Neely, Arlington, Virginia, for the appellees, Natu Bah, Builguissa Diallo, and Star Brumfield.

Jonathan Skrmetti, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Stephanie Bergmeyer, Senior Assistant Attorney General; Jim Newsom; E. Ashley Carter; Matt R. Dowty; Robert W. Wilson; and Shanell Tyler, Assistant Attorneys General, for the appellees, Governor Bill Lee, the Tennessee Department of Education, the Tennessee State Board of Education, and Penny Schwinn, Education Commissioner.

M.E. Buck Dougherty, III, Chicago, Illinois, for the appellees, Greater Praise Christian Academy, Sensational Enlightenment Academy Independent School, Ciera Calhoun, Alexandria Medlin, and David Wilson, Sr.

# OPINION

## Background

This case was disposed of at the motion to dismiss stage on grounds of standing and ripeness. As the Tennessee Supreme Court has explained, "[o]n a motion to dismiss, the Court presumes all factual allegations to be true and construes them in favor of the plaintiff." *Metro. Gov't of Nashville & Davidson Cnty. v. Tenn. Dep't of Educ.*, 645 S.W.3d 141, 147-48 (Tenn. 2022). This presumption of truth "is equally true with respect to factual allegations regarding standing." *Id.* at 148. A trial court's legal conclusions regarding the adequacy of a complaint are reviewed *de novo*. *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011). Thus, we review Plaintiffs' operative amended complaint filed in August 2022 to determine whether Plaintiffs alleged enough to establish standing as taxpayers and/or parents and whether their claims are ripe for judicial review. At this motion to dismiss stage, we must accept Plaintiffs' factual allegations as true and construe them in Plaintiffs' favor.

-2-

Plaintiffs sued State Defendants in the Trial Court challenging the ESA Act.[2]  At this motion to dismiss stage, Plaintiffs' factual allegations are the universe of facts we can consider.  Given the standard of review, we deem it appropriate to quote substantially from Plaintiffs' amended complaint.   In their amended complaint, Plaintiffs alleged in substantial part:

50. During the 2019 session, the Tennessee Legislature enacted the Voucher Law, T.C.A. § 49-6-2601, *et seq.*  On May 24, 2019, Governor Lee signed the bill into law.

51. As discussed below, the Voucher Law establishes a voucher program exclusively in Davidson and Shelby Counties.

52. The Voucher Law diverts taxpayer funds that were appropriated to maintain and support public schools in Shelby County Schools and Metro Nashville Public Schools to private schools and other private education expenses.  Under the Voucher Law, BEP [Basic Education Program] funds (in 2022-2023) and TISA [Tennessee Invest in Student Achievement Act] funds (in 2023-2024 and thereafter) otherwise payable to Shelby County Schools and Metro Nashville Public Schools are to be deposited into an "Education Savings Account" ("ESA") for each participating voucher student.

53. The General Assembly did not make an appropriation for the estimated first year's funding of the Voucher Law during the session in which it was enacted.

54. Despite the absence of an appropriation for the estimated funding of the Voucher Law in fiscal year 2019, Defendant TDOE entered into a $2.5 million contract in November 2019 with ClassWallet, a private, for-profit company based in Florida.  Under this contract, ClassWallet was to oversee online application and payment systems for the voucher program.  ClassWallet began work under this contract in November 2019.

55. Defendant TDOE paid ClassWallet approximately $1.2 million in 2019 for performance under this contract, despite the fact that no money was appropriated for the first year of the Voucher Law.  According to testimony by the TDOE's deputy commissioner before the General Assembly's Joint Government Operations Committee on January 27, 2020, the TDOE diverted funds appropriated by the General Assembly for the unrelated "Career

---

[2] The Metropolitan Government of Nashville and Davidson County and the Shelby County Government, or County Plaintiffs, also filed suit to challenge the ESA Act.  However, this Court entered an order upon the stipulation of the parties pursuant to Tenn. R. App. P. 15(a) dismissing the Metropolitan Government of Nashville and Davidson County and the Shelby County Government from this appeal.

Ladder" program for public school teachers to pay ClassWallet for services performed to implement the Voucher Law.

## B. The Voucher Law Targets Shelby and Davidson Counties

56. The Voucher Law applies to public schools and students in only two Tennessee counties: Shelby and Davidson.

57. The eligibility criteria for participation in the ESA voucher program requires that a student:

(i) Is zoned to attend a school in an LEA [local education agency], excluding the achievement school district (ASD), with ten (10) or more schools:

(a) Identified as priority schools in 2015, as defined by the state's accountability system pursuant to § 49-1-602;

(b) Among the bottom ten percent (10%) of schools, as identified by the department in 2017 in accordance with § 49-1-602(b)(3); and

(c) Identified as priority schools in 2018, as defined by the state's accountability system pursuant to § 49-1-602; or

(ii) Is zoned to attend a school that is in the ASD on May 24, 2019.

T.C.A. § 49-6-2602(3)(C).[3]

58. In the entire State of Tennessee, the only LEAs that meet the specific criteria in subsection (i) above are Shelby County Schools and Metro Nashville Public Schools.

59. As of the date specified in subsection (ii) — May 24, 2019 — all of the public schools in the ASD were located in Shelby and Davidson Counties.

\*\*\*

61. The history of the Voucher Law makes clear that the General Assembly intended the Law to apply only to Shelby and Davidson Counties. When the bill was first introduced, it applied to five counties — Shelby, Davidson, Hamilton, Madison, and Knox — but three were removed to secure the votes needed for passage by the General Assembly.

62. There are numerous references in the legislative record demonstrating the General Assembly's intent to limit the Voucher Law to

---

[3] This section was amended in part by 2023 Pub.Acts, c. 328, § 1, *eff.* May 5, 2023, to include in the eligibility criteria: "Identified as priority schools in 2021, as defined by the state's accountability system pursuant to § 49-1-602[.]" Tenn. Code Ann. § 49-6-2602(3)(C)(i)(*d*).

-4-

Shelby County Schools and Metro Nashville Public Schools. For example, on April 25, 2019, Senator Joey Hensley explicitly stated during debate on the Senate Floor that the Voucher Law would cover only Davidson and Shelby County schools.

63. When the votes on the Voucher Law were cast and there was a 49-49 tie, then-Speaker Glen Casada held the vote open for over 38 minutes. During that time, he engaged in a lengthy discussion with Knoxville Representative Jason Zachary, who opposed the bill, on a balcony behind the House building. After that discussion, Knox County was no longer subject to the Voucher Law, Representative Zachary switched his vote, and the bill passed.

***

69. For every student who attends Shelby County Schools and Metro Nashville Public Schools, the State provides just the state share of the BEP. The local share comes from the county — from local revenue sources. When a student leaves the district without using a voucher, *e.g.*, if that student moves out of district or attends a private school without a voucher, the district only loses the state share. When a student leaves Shelby County Schools or Metro Nashville Public Schools to use a voucher, the districts lose — out of their state allocation — an amount representing the state and local shares.

70. TDOE estimates that for the current school year, the voucher amount will be $8,192 per pupil. TDOE, Education Savings Account Program, *How the ESA Program Works 2022, available at* https://esa.tnedu.gov/ ("Each ESA is funded at approximately $8,192 to pay for private school tuition or other approved educational expenses."). So for each voucher student, Shelby County Schools or Metro Nashville Public Schools will lose this amount in state finding.

71. For example, for the 2022-23 school year, Metro Nashville Public Schools' total state share of the BEP is $297,722,000. The relevant student count to determine the per-pupil state share is 78,521. So, the per-pupil state contribution is $3,791.62. The total local share of the BEP is $421,825,000, or $5,372.13 per-pupil. Thus, when a student leaves Metro Nashville Public Schools for a reason other than taking a voucher, Metro Nashville Public Schools would lose $3,791.62 in state funds. When a student leaves to use a private school voucher, the County/District will lose more than twice that amount of state funding, or $8,192.

72. For the 2022-2023 school year, Shelby County Schools' total state share of the BEP is $651,789,000. The relevant student count to determine the per-pupil state share is 109,835. So, the per-pupil state contribution is

$5,934.26. The total local share of the BEP is $283,036,000, or $2,576.92 per pupil. Thus, when a student leaves Shelby County Schools for a reason other than taking a voucher, Shelby County Schools would lose $5,934.26 in state funds. When a student leaves to use a private school vouchers, the County/District will lose significantly more than that amount of state funding, or $8,192.

73. In enacting TISA in 2022, the Legislature amended the Voucher Law to replace any reference to the BEP with TISA. 2022 Tenn. Laws Pub. Ch. 966 (H.B. 2143), §§ 53-56. This includes amending the voucher funding calculation and funding source to replace BEP with TISA. *Id.*, §§ 54-55.

74. The TISA amount for each district represents both a state share, coming from state funds, and a local share, from local revenue sources. T.C.A. § 49-3-109. Starting in the 2023-2024 school year, the voucher amount subtracted from each targeted LEA will be the state ***and*** local shares — up to the combined statewide average — of the State and local per-pupil TISA allocation.

75. Thus, under TISA, the voucher funding mechanism will operate the same way it does under the BEP. Pursuant to the Voucher Law, the districts will still lose an amount representing both the state and local shares of public education funding for each student who leaves the district to use a voucher.

76. The Voucher Law, under both the BEP and TISA, requires LEAs to continue to count students who leave the district to use a voucher as enrolled in the district. T.C.A. § 49-6-2605(b)(1). Thus, the LEAs must raise local funds from taxpayers as if those students were still in the district. Requiring that the districts count students as enrolled increases the amount of local money the districts must raise from local tax dollars in order to satisfy state "maintenance of effort" requirements.

77. The Voucher Law allows up to 5,000 vouchers during the first school year that the program is implemented. T.C.A. § 49-6-2604(c). In each subsequent school year, the law allows an increase of 2,500 vouchers. *Id.* In the fifth year and thereafter, the law allows up to 15,000 vouchers. *Id.*

78. In year one, tens of millions in BEP funds will be diverted from Shelby County Schools and Metro Nashville Public Schools if 5,000 students use a voucher. By year five, ***hundreds of millions*** in BEP/TISA funds could be diverted from Shelby County Schools and Metro Nashville Public Schools.

***

82. The hundreds of millions of dollars that will be diverted from Shelby County Schools and Metro Nashville Public Schools under the Voucher Law will drastically exacerbate the current underfunding of Shelby County Schools and Metro Nashville Public Schools. The Voucher Law will require Shelby County Schools and Metro Nashville Public Schools to make further reductions in teachers, support staff, technology, and other resources essential to providing a constitutionally adequate education to their students.

83. The Voucher Law authorizes grants for Shelby County Schools and Metro Nashville Public Schools from a "school improvement fund" for up to three years. T.C.A. § 49-6-2605(b)(2). These grants are expressly subject to an appropriation of funds by the General Assembly each year. *Id*.

84. The Voucher Law restricts the use of these grants, if appropriated, to "school improvement" only. Thus, these grants, even if available, cannot be used for general operating funds and consequently will not replace the state and local BEP funds diverted from Shelby County Schools and Metro Nashville Public Schools under the Voucher Law.

85. Even if the General Assembly fully funds these "school improvement grants," the grants will not compensate Shelby County Schools and Metro Nashville Public Schools for the loss of BEP funds for each student who uses a voucher. The grants equal only the amount of money diverted to ESA voucher accounts for students who "[w]ere enrolled in and attended a school in the LEA for the one (1) full school year immediately preceding the school year in which the student began participating in the program." T.C.A. § 49-6-2605(b)(2)(A)(i). This does not include students who are "eligible for the first time to enroll in a Tennessee school" — for example, those entering kindergarten — who are also eligible for the voucher program. T.C.A. § 49-6-2602(3)(A)(ii).

86. In addition to the initial loss of BEP/TISA funds by Shelby County Schools and Metro Nashville Public Schools, the Voucher Law provides that, when an ESA account is closed for any number of reasons, the remaining funds are returned to the State's BEP/TISA account rather than returned to Shelby County Schools or Metro Nashville Public Schools. T.C.A. §§ 49-6-2603(e), 49-6-2608(e). Even when a voucher student returns to Shelby County Schools or Metro Nashville Public Schools and the district resumes full responsibility for educating that student, the funds remaining in the student's ESA account are returned to the State and not to the district. T.C.A. § 49-6-2603(e).

87. Furthermore, a student's departure from Shelby County Schools or Metro Nashville Public Schools to use a voucher does not relieve the districts of all of the costs associated with that student.

88. Shelby County Schools and Metro Nashville Public Schools bear substantial fixed costs in operating their public schools. These fixed costs include facilities repair and maintenance, teacher and staff pensions, debt service, and long-term contracts. Because participants in the voucher program will exit Shelby County Schools and Metro Nashville Public Schools from different schools, grade levels, and classrooms, the districts will be unable to proportionately reduce these fixed costs. Moreover, because students will leave the districts from different classrooms, grades, and schools, the districts will likewise not be able to proportionately reduce variable costs, such as staff, programs, and services. Thus, the districts will be unable to rely on reduced costs to cover the loss of BEP or TISA funds under the Voucher Law.

89. As set forth below, the Voucher Law permits private schools participating in the voucher program to deny enrollment to students with elevated needs, including students with disabilities, who may be more expensive to educate. As a result, the Voucher Law will likely increase the concentration of more costly-to-educate students in Shelby County Schools and Metro Nashville Public Schools, with less money available for their support and growth.

Based on these factual allegations, Plaintiffs alleged six causes of action. Plaintiffs have appealed the dismissal of only their first, second, and sixth causes of action, which read as follows:

**FIRST CAUSE OF ACTION**
**(Violation of the Education and Equal Protection Clauses**
**of the Tennessee Constitution)**

112. Plaintiffs incorporate all allegations in all preceding paragraphs as if fully set forth herein.

113. Under the Tennessee Constitution, the State of Tennessee, through the General Assembly, must maintain and support a system of public schools that provides adequate and substantially equal educational opportunities to all children residing in the State. TENN. CONST., art. I, § 8; art. XI, §§ 8, 12; *Small Sch. Sys. I*, 851 S.W.2d at 139; *Small Sch. Sys. II*, 894 S.W.2d at 734; *Tenn. Small Sch. Sys. v. McWherter* ("*Small Sch. Sys. III*"), 91 S.W.3d 232 (Tenn. 2002).

114. In the *Small School Systems* rulings, the Tennessee Supreme Court invalidated the State's previous school funding system because it deprived public school students in certain LEAs of substantially equal educational opportunities. *Small School Systems I*, 851 S.W.2d at 156. The

-8-

Supreme Court also declared that the General Assembly's enactment of the BEP statute and funding formula was intended to cure those constitutional deficiencies. *Small Sch. Sys. II*, 894 S.W.2d at 736.

115. The Voucher Law will deprive students in Shelby County Schools and Metro Nashville Public Schools of substantially equal educational opportunities by diverting the BEP/TISA funds appropriated by the General Assembly to maintain and support their schools to pay for private school tuition and other private educational expenses.

116. Currently through the BEP statute, and after 2022-2023 through the TISA statute, the General Assembly provides funding to maintain and support an adequate education for students in the State's system of public schools. Because the Voucher Law diverts substantial BEP/TISA funds intended to maintain and support Shelby County Schools and Metro Nashville Public Schools away from those districts, the Law deprives students in Shelby County Schools and Metro Nashville Public Schools of the BEP/TISA funds deemed legally necessary to provide them with an adequate and equal education.

117. The current funding provided by the General Assembly through the BEP statute is demonstrably inadequate to enable Shelby County Schools and Metro Nashville Public Schools to provide the teachers, support staff, and other resources necessary to afford all students an adequate education under Article I, § 8, and Article XI, §§ 8 and 12, of the Tennessee Constitution. The diversion of BEP funds under the Voucher Law will further deprive Shelby County Schools and Metro Nashville Public Schools of the funding required to provide their students with a constitutionally-mandated adequate and equal education.

118. Because the Voucher Law alters and diminishes the BEP/TISA funds appropriated by the General Assembly to maintain and support Shelby County Schools and Metro Nashville Public Schools, the Law violates the Equal Protection and Education Clauses of the Tennessee Constitution, Article I, § 8; Article XI, §§ 8, 12, for students in Shelby County Schools and Metro Nashville Public Schools.

## SECOND CAUSE OF ACTION

**(Violation of the Requirement of a Single System of Public Schools Mandated by the Education Clause of the Tennessee Constitution)**

119. Plaintiffs incorporate all allegations in all preceding paragraphs as if fully set forth herein.

120. The Tennessee Constitution's Education Clause, Article XI, § 12, requires the General Assembly to provide for the maintenance, support and eligibility standards of "*a* system of free *public* schools" (emphasis added). The Tennessee Constitution does not permit the General Assembly to maintain and support schools outside the system of free public schools.

121. The Voucher Law diverts BEP funds appropriated by the General Assembly to maintain and support Tennessee public schools to instead pay for tuition and other expenses in private schools that do not comply with the requirements of a single system of public schools.

122. The private schools authorized by the Voucher Law to participate in the voucher program are not — and cannot, by the express terms of the Law — be part of the State of Tennessee's system of free public schools.

123. Under the Voucher Law, participating private schools are not required to comply with the same academic and eligibility standards required by State law for Tennessee's system of free public schools.

124. Under the Voucher Law, participating private schools are expressly exempt from the legal obligation to enroll and educate all students, as is required in Tennessee's system of free public schools. The participating private schools can deny enrollment or otherwise discriminate against students based on characteristics such as disability, religion, English proficiency, LGBTQ status, and ability to pay tuition or fees.

125. Under the Voucher Law, participating private schools are not required to provide services that public schools are obligated under state and federal law to provide to students, including special education services for students with disabilities.

126. Under the Voucher Law, participating private schools are not subject to the requirements imposed by State law on public schools to protect students from harassment, intimidation, or bullying.

127. Under the Voucher Law, participating private schools are not required to comply with the same governance and accountability mandates of state law that apply to Tennessee's system of free public schools.

128. The Voucher Law violates the General Assembly's obligation in Article XI, § 12 of the Tennessee Constitution to maintain and support "*a system*" of "free *public* schools" (emphases added).

***

## SIXTH CAUSE OF ACTION
**(Violation of the Appropriation of Public Moneys Provisions of the Tennessee Constitution and T.C.A. § 9-4-601)**

146. Plaintiffs incorporate all allegations in all preceding paragraphs as if fully set forth herein.

147. Article II, § 24, of the Tennessee Constitution provides:

> Any law requiring the expenditure of state funds shall be null and void unless, during the session in which the act receives final passage, an appropriation is made for the estimated first year's funding.

148. Article II, § 24, of the Tennessee Constitution also provides: "No public money shall be expended except pursuant to appropriations made by law.["]

149. By statute, "[n]o money shall be drawn from the state treasury except in accordance with appropriations duly authorized by law." T.C.A. § 9-4-601(a)(1).

150. The Voucher Law was enacted by the General Assembly in its 2019 legislative session.

151. During the 2019 legislative session, the General Assembly did not make an appropriation for the estimated first year's funding of the Voucher Law.

152. In November 2019, Defendant TDOE signed a $2.5 million contract with a private for-profit company, ClassWallet, to undertake the administration of the Voucher Law. ClassWallet began work under the contract in November 2019.

153. TDOE diverted public funds from an unrelated, existing State program supporting public school teachers to instead pay ClassWallet $1.2 million in 2019 for its work on the voucher program.

154. TDOE's expenditures for the ClassWallet contract, or any other expenditures for the administration and implementation of the Voucher Law in 2019, without appropriation for the estimated first year's funding of the Voucher Law, render the Voucher Law null and void under Article II, § 24 of the Tennessee Constitution and violate T.C.A. § 9-4-601.

155. Moreover, TDOE's plan to spend public money to reimburse private schools directly also violates the Appropriations of Public Money provisions. There is no law authorizing this expenditure of public money.

Defendants filed motions to dismiss and for judgment on the pleadings. In November 2022, the Trial Court ruled 2-1 in favor of Defendants on grounds that Plaintiffs lack standing and that their claims are not ripe. The Trial Court expressly declined to rule on any other grounds. The Trial Court majority concluded, as relevant:

> The parties in this matter appeared through counsel on September 19, 2022, before this Court—presided over by a Three-Judge Panel appointed by

the Tennessee Supreme Court pursuant to Tenn. Code Ann. § 20-18-101 and Tenn. Sup. Ct. Interim R. 54—to argue six motions made under Rule 12 of the Tennessee Rules of Civil Procedure. These motions consist of four motions to dismiss and two motions for judgment on the pleadings brought by the defendants and intervenor-defendants in this matter. The Court took the motions under advisement and is now ready to rule.

For the reasons that follow, we hold the plaintiffs in this case lack standing to pursue their claims. In the alternative, we hold those claims lack ripeness. Therefore, the motions of the defendants and intervenors are **GRANTED** with respect to those issues and **DENIED** as moot as to all other issues. The Amended Complaints are **DISMISSED**.

***

B. *Standing of <u>McEwen</u> Plaintiffs*

I . Taxpayer Standing

Generally, "private citizens . . ., cannot maintain an action complaining of the wrongful acts of public officials unless such private citizens aver special interest or a special injury not common to the public generally." *Fannon v. City of LaFollette*, 329 S.W.3d 418, 427 (Tenn. 2010) (quoting *Bennett v. Stutts*, 521 S.W.2d 575, 576 (Tenn. 1975)). An exception exists, however, when the taxpayer has (1) alleged a "specific illegality in the expenditure of public funds," and (2) made a "prior demand on the governmental entity asking it to correct the alleged illegality." *Id.* (quoting *Cobb v. Shelby Cnty. Bd. of Comm'rs*, 771 S.W.[2]d 124, 126 (Tenn. 1989)). Our Supreme Court has elaborated further:

> As this Court explained in *Cobb*, the taxpayer's complaint "must allege a specific legal prohibition on the disputed use of funds or demonstrate that it is outside the grant of authority to the local government." In establishing that a prior demand has been made, a plaintiff is required to "first have notified appropriate officials of the illegality and given them an opportunity to take corrective action short of litigation." A prior demand "is excused [only] where the status and relation of the involved officials to the transaction in question is such that any demand would be a formality."

*Id*. at 427-28 (citations omitted) (alteration in original).

-12-

State Defendants and Intervenor-Defendants argue first that taxpayer status must fail because no prior demand has been made in this case. *McEwen* Plaintiffs argue that such a demand would have been futile because of State Defendants['] direct involvement in the negotiations for and ultimately enactment of the ESA Act, and thus a mere formality satisfying the exception to the requirement.

The Court is disinclined to exempt Plaintiffs from the prior demand in this case. *McEwen* Plaintiffs point to the reasoning of the Court of Appeals in *Ragsdale v. City of Memphis*, 70 S.W.3d 56, 63 (Tenn. Ct. App. 2001): "In the instant ease, the executives of both City and County have actively participated in the negotiations involving the NBA franchise, have signed required legislation, and have ultimately signed the required contractual documents. Under these circumstances, a prior demand would be a mere formality and should be excused." Here, *McEwen* Plaintiffs maintain their allegations regarding Governor Lee (campaigned on and signed the ESA Act), Education Commissioner Schwinn (moved to quickly implement the Act), Members of the State Board of Education (adopted the administrative rules implementing the Act), and former House Speaker Glen Casada (holding open the vote on the Act to negotiate its final passage) demonstrate similar active participation. But extending the rationale of *Ragsdale* to this scenario would swallow the prior-demand requirement entirely. Governors regularly campaign on future legislation and in most cases sign legislation before it becomes law. Agencies and their officials regularly implement new legislation. A house speaker regularly shepherds bills across the finish line. By applying the exception here, this Court would render it no exception at all.

Furthermore, State Defendants and Intervenor-Defendants also argue that *McEwen* Plaintiffs only made an allegation of "specific illegality" with respect to Count VI, their appropriations claim. *McEwen* Plaintiffs respond that all of their claims allege that the expenditure of funds under the ESA is illegal based on the respective constitutional provision or state statute that gives rise to their claim. State Defendants counter that the requirement of an allegation of specific illegality means something more—"a specific legal prohibition on the disputed use of funds or demonstrat[ion] that it is outside the grant of authority to the local government." *Fannon*, 329 S.W.3d at 427 (citing *Cobb*, 771 S.W.2d at 126). The Court must agree with State Defendants lest this exception also grow so broad as to swallow the rule. Under *McEwen* Plaintiffs['] rationale, any government act that uses funds from the state treasury would create taxpayer standing if the taxpayer could formulate a claim of unconstitutionality or other statutory violation. This would undermine the entire basis for the doctrine of taxpayer standing. *See*

*id*. at 427 (quoting *Badgett v. Rogers*, 436 S.W.2d 292, 293-94 ) ("[T]he courts have long recognized the necessity of allowing municipal officials to perform their duties without interference from frequent and possibly frivolous litigation and the inexpedience of putting municipal officers at hazard to defend their acts whenever any member of the community sees fit to make the assault, whether for honorable motives or not."). Of *McEwen* Plaintiffs' claims, the appropriations claim alone alleges an illegality in the expenditure itself rather than unconstitutionality or unlawful implementation of the ESA Act. But, as already discussed, the appropriations claim still lacks the requirement for a prior demand.

Accordingly, the Court finds that *McEwen* Plaintiffs have failed to establish taxpayer standing for their claims. With respect to taxpayer standing, the motions of State Defendants are **GRANTED**. As far as the Court can discern, Plaintiff Russell, who does not claim she has a child affected by the ESA, only seeks standing as a taxpayer. Therefore, she is **DISMISSED** as a party to this action.

### 2. Standing as Parents

State Defendants and Intervenor-Defendants next argue the remaining *McEwen* Plaintiffs, Parent Plaintiffs, lack standing as parents because they cannot show that their children have been or will be harmed by the ESA Program. Parent Plaintiffs respond that this contention is incorrect and ultimately unpersuasive because they can demonstrate the harm caused.

### i. Education Clause Violation (Equal Protection)

Parent Plaintiffs' first cause of action is an alleged violation of the requirement articulated in *Small Schools I*, 851 S.W.2d at 151, at the conjunction of the Education Clause and the Tennessee Constitution's Equal Protection provisions that Parent Plaintiffs' children are entitled to the opportunity for a free, public education that is adequate and substantially equal as the opportunities afforded to all other Tennessee schoolchildren. Parent Plaintiffs have argued that the ESA Act diverts funds from the school districts in their counties alone and that the remaining funding is inadequate. As already discussed in the context of County Plaintiffs, however, this alleged injury is merely speculative while the school improvement fund is in effect. If there is no loss of funds, there is no disparate treatment—and therefore, no injury. The Court holds Parent Plaintiffs lack standing for this claim.

### ii. Education Clause Violation (public funding of private schools)

The second cause of action alleges the ESA Act violates the Education Clause by diverting funds from the schools of Parent Plaintiffs' children to fund private education, something Parent Plaintiffs argue is unconstitutional. As with Count I, the alleged injury has not occurred because the diverted funds have been replaced. Absent the necessary injury to challenge the ESA Act on this basis, Parent Plaintiffs lack standing for this cause of action as well.

***

### vi. Appropriations Clause Violation

The sixth cause of action alleges that the Tennessee Department of Education contracted in 2019 with a private company to administer the ESA Program without an appropriation as required by Article II, Section 24 of the Tennessee Constitution. This expenditure without an appropriation again has no causal connection to the alleged harm—diversion of funds from their children's schools to the detriment of their children's education. Thus, the Court must again find that Parent Plaintiffs lack standing to bring Count VI.

## II. Ripeness

Alternatively, we hold that Plaintiffs' claims lack ripeness. Ripeness is another justiciability doctrine, inquiring "whether the harm asserted has matured sufficiently to warrant judicial intervention." *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975) (quoted favorably in *Darnell*, 195 S.W.3d at 620 n.7). The Tennessee Supreme Court has explained that a claim lacks ripeness when it "involves uncertain or contingent future events that may or may not occur as anticipated or, indeed, may not occur at all." *B&B Enterprs. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 848 (Tenn. 2010) (citing *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 479-80 (1990)). The Court's determination of ripeness involves two questions: first, whether the claim is "appropriate for judicial resolution"; and second, whether the Court's "refusal to act" would prejudice the claimants' ability to seek redress of their grievances. *Id*. In other words, has the claimants' alleged injury occurred or might it occur in the future? *See State v. Price*, 579 S.W.3d 332, 338 (Tenn. 2019) (quoting *West v. Schofield*, 468 S.W.3d 482, 491 (Tenn. 2015)) ("An issue is not fit for judicial decision if it is based 'on hypothetical and contingent future events that may never occur.' Rather, the issue must

be 'based on an existing legal controversy.'").  And if the injury has not yet occurred, will the claimants be able to seek relief when it does occur?  *See id*.  (quoting *West*, 468 S.W.3d at 492) ("The second prong of the ripeness analysis takes into account 'whether withholding adjudication . . . will impose any meaningful hardship on the parties.'"); *B&B Enterprs. of Wilson Cnty., LLC*, 318 S.W.3d at 849 (quoting *AmSouth Erectors, LLC v. Skagg Iron Works, Inc.*, W2002-01944-COA-R3-CV, 2003 WL 21878540, at *6 (Tenn. Ct. App. Aug. 5, 2003)) ("The court will decline to act 'where there is no need for the court to act or where the refusal to act will not prevent the parties from raising the issue at a more appropriate time.'").

State Defendants argue Plaintiffs' equal protection and education clause claims are unripe because they rely on the allegation of an inequitable distribution of funds—thereby treating Shelby and Davidson Counties and their schools unequally as well as depriving the students in those schools of an adequate education—when those funds have not yet been distributed. Moreover, argue State Defendants, citing Tenn. Code Ann. §§ 49-6-2603(a)(1)-(3) and -2605(b)(2)(A), the Davidson and Shelby LEAs will keep some state funds to educate ESA students without the actual obligation to educate those students.  State Defendants further point to Tenn. Code Ann. § 49-6-2605(b)(2)(A)'s establishment of a school improvement fund from which the Department of Education "shall disburse an annual grant to each LEA to be used for school improvement in an amount equal to the ESA amount for participating students under the program."  Thus, argue State Defendants, these LEAs can expect to receive more money per student than they would in the absence of the ESA.  Still further, State Defendants argue the alleged harm, if it ever occurs, is to the LEAs not the Plaintiff Counties or the children of the Plaintiff Parents.

Plaintiff Counties respond that State Defendants are implementing the ESA Program right now, citing Governor Lee's statement on social media that the program was actively accepting applicants, meaning Plaintiffs' claims raise a live controversy, not some hypothetical, future event.  Plaintiff Counties frame the injury here not merely as the additional financial burden placed upon them but the loss of discretion over their own funding choices as the result of a single ESA award.  With respect to the Education Clause, Parent Plaintiffs argue that their children attend schools that already had unconstitutionally inadequate funding and now are being further deprived. They further argue that withholding judgment on the ESA Act would impose a meaningful hardship by further depriving their children's schools of funding.

Here, the actual difference in funding caused by the ESA Act will not occur, if ever, until after three fiscal years because the Act establishes a

-16-

school improvement fund that will award the affected schools "an amount equal to the ESA amount for participating students under the program." Tenn. Code Ann. § 49-6-2605(b)(2)(A). Plaintiffs nevertheless allege a shortfall will exist between the amount diverted and the amount awarded because of the sub-provisions requiring the student to have actually been calculated into the BEP and ESA formulae. *See* Tenn. Code Ann. § 49-6-2605(b)(2)(A)(i)-(ii); McEwen Pls.' Am. Compl., ¶¶ 82-89, No. 20-0143-II & No. 20-0242-II, Aug. 3. 2020, Am. Compl. for Decl. & lnj. Relief, ¶¶ 156-67, No. 20-0143-II & No. 20-0242-II, Aug. 3, 2020. This is not enough, and Plaintiffs' argument continues to rely on speculation. No differential treatment between Plaintiffs' schools and the others of this state or other financial injury can exist under the ESA Act until a funding gap occurs. Similarly, no divestment of the schools of Parent Plaintiffs' children can occur before the alleged funding gap occurs. Before such time, this controversy is merely a disagreement of public policy and inappropriate for judicial decision.

The question remains whether Plaintiffs are prejudiced by dismissal of their claims. We find their arguments in the affirmative unpersuasive. Should the alleged injury occur in the future, Plaintiffs would have the recourse of pursuing appropriate litigation. Permitting State Defendants to implement a policy Plaintiffs disagree with will not jeopardize their rights.

Accordingly, the Court holds in the alternative that Plaintiffs' claims lack ripeness and should be **DISMISSED**.

## Conclusion

Finding no distinct and palpable injury to Plaintiffs in light of the ESA Act's replacement of diverted funds, we hold Plaintiffs lack standing to challenge the Act. In several instances, Plaintiffs' claims had no bearing on the alleged injury to begin with, lacking a necessary causal connection between the nature of the cause of action and the alleged injury. The Court alternatively holds that Plaintiffs' claims are not yet ripe because the ESA replaces the diverted funding for at least three years. Therefore, State Defendants' and Greater Praise Intervenor-Defendants' motions are **GRANTED** on these articulated bases. Parent-Intervenors' motions for judgment on the pleadings are not reached by the Court and therefore **DENIED** as moot. The Amended Complaints are **DISMISSED**.

Any other relief requested is hereby **DENIED**.

(Footnotes omitted).

Chancellor Martin wrote a concurring and dissenting opinion in which she stated, in part: "[Plaintiffs] have alleged the ESA Act deprives their children's schools of funds unlike the schools of children in other counties, and they have alleged that the stopgap provision is inadequate to cover those losses. . . . [T]he Court ought to accept these allegations and move forward in its analysis because the allegations are sufficient for standing." Chancellor Martin stated further that, in her judgment, Plaintiffs' claims were ripe for judicial review. Chancellor Martin would have permitted Plaintiffs' education clause claims, as well as their BEP/TISA claim, to move forward. Plaintiffs timely appealed to this Court.

**Discussion**

Although not stated exactly as such, Plaintiffs raise the following issues on appeal: 1) whether the Trial Court erred in ruling that Plaintiffs lacked standing to challenge the constitutionality of the ESA Act under the Education and Equal Protection Clauses of the Tennessee Constitution; 2) whether the Trial Court erred in ruling that Plaintiffs lacked standing to challenge the constitutionality of the ESA Act for violating the requirement of a single system of public schools mandated by the Education Clause of the Tennessee Constitution; 3) whether the Trial Court erred in ruling that Plaintiffs lacked standing to challenge the ESA Act for violating the Appropriation of Public Moneys provisions of the Tennessee Constitution and Tenn. Code Ann. § 9-4-601; and 4) whether the Trial Court erred in ruling that Plaintiffs' claims were not ripe.[4]

The Tennessee Supreme Court has articulated the applicable standard of review as follows:

> The trial court decided the issue of standing on the State's motion to dismiss pursuant to Tennessee Rule of Civil Procedure 12.02(6). The Court reviews the motion to dismiss on the issue of standing de novo with no presumption of correctness. *Effler v. Purdue Pharma, L.P.*, 614 S.W.3d 681, 687 (Tenn. 2020). On a motion to dismiss, the Court presumes all factual allegations to be true and construes them in favor of the plaintiff. *Foster v. Chiles*, 467 S.W.3d 911, 914 (Tenn. 2015). This is equally true with respect to factual allegations regarding standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (For the purposes of a challenge to standing "[a]t the pleading stage, general factual allegations of

_____

[4] Bah Defendants ask that we affirm the Trial Court's ruling on the alternative grounds that Plaintiffs failed to state a claim for relief, grounds which the Trial Court declined to address. We, too, decline to address in the first instance whether Plaintiffs stated a claim for relief. Instead, we address only the grounds actually ruled on by the Trial Court: standing and ripeness.

injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." (second alteration in original) (internal quotation marks omitted)).

*Metro. Gov't*, 645 S.W.3d at 147-48 (footnote omitted).

Three of the four issues on appeal implicate whether Plaintiffs have standing. The Tennessee Supreme Court has discussed the doctrine of standing, and how a plaintiff establishes standing, as follows:

> The United States Constitution confines the jurisdiction of the federal courts to "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. Although the Constitution of Tennessee does not include a similar express limitation on the exercise of judicial power, *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam County*, 301 S.W.3d 196, 202 (Tenn. 2009) (citing *Miller v. Miller*, 149 Tenn. 463, 261 S.W. 965, 971 (1924)), Tennessee courts have long recognized that "the province of a court is to decide, not advise, and to settle rights, not to give abstract opinions," *id*. at 203 (quoting *State v. Wilson*, 70 Tenn. 204, 210 (1879)). Tennessee courts therefore decide only "legal controversies." *Id*. (quoting *White v. Kelton*, 144 Tenn. 327, 232 S.W. 668, 670 (1921)). To determine whether a particular case involves a legal controversy, Tennessee courts utilize justiciability doctrines that "mirror the justiciability doctrines employed by the United States Supreme Court and the federal courts." *Id*.; *see also West v. Schofield*, 468 S.W.3d 482, 489-90 (Tenn. 2015). One of these justiciability doctrines—standing—is disputed in this appeal.

> To determine whether standing exists, a court must focus on the party bringing the lawsuit rather than on the merits of the claim. *Fisher v. Hargett*, 604 S.W.3d 381, 396 (Tenn. 2020); *Metro. Air Rsch. Testing Auth., Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 842 S.W.2d 611, 615 (Tenn. Ct. App. 1992); *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 799-800, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015). The weakness of a claim on the merits must not be confused with a lack of standing. *Ariz. State Legislature*, 576 U.S. at 800, 135 S.Ct. 2652. While standing "often turns on the nature and source of the claim asserted," it "in no way depends on the merits" of the claim. *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *see also Fisher*, 604 S.W.3d at 396. Rather, to establish standing, three elements must be satisfied:

> 1) a distinct and palpable injury; that is, an injury that is not conjectural, hypothetical, or predicated upon an interest that a litigant shares in common with the general public; 2) a causal connection between the alleged injury and the challenged conduct; and 3) the injury must be capable of being redressed by a favorable decision of the court.

*Fisher*, 604 S.W.3d at 396 (citing *City of Memphis v. Hargett*, 414 S.W.3d 88, 97 (Tenn. 2013)). In this case, the crux of the controversy involves the first element.

> The plaintiff bears the burden of establishing these elements " 'by the same degree of evidence' as other matters on which the plaintiff bears the burden of proof." *ACLU of Tenn. v. Darnell*, 195 S.W.3d 612, 620 (Tenn. 2006) (quoting *Petty v. Daimler/Chrysler Corp.*, 91 S.W.3d 765, 767 (Tenn. Ct. App. 2002)). The degree of evidence depends, of course, upon the stage of litigation at which standing is challenged. *See Petty*, 91 S.W.3d at 767; *see also Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 ("The party invoking federal jurisdiction bears the burden of establishing these elements. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." (citations omitted)). In this case, Defendants challenged standing through a motion to dismiss. Accordingly, Plaintiffs' factual allegations are presumed to be true and are construed in their favor. *Foster*, 467 S.W.3d at 914; *see also Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

*Metro. Gov't*, 645 S.W.3d at 148-49 (footnote omitted).

The first of Plaintiffs' issues we address is whether the Trial Court erred in ruling that Plaintiffs lacked standing to challenge the constitutionality of the ESA Act under the Education and Equal Protection Clauses of the Tennessee Constitution. Article I, section 8 of the Tennessee Constitution states: "That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." In addition, Article XI, section 8 of the Tennessee Constitution provides, as relevant:

> The Legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of

individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals, rights, privileges, immunitie[s], or exemptions other than such as may be, by the same law extended to any member of the community, who may be able to bring himself within the provisions of such law.

Meanwhile, Article XI, Section 12 of the Tennessee Constitution provides: "The State of Tennessee recognizes the inherent value of education and encourages its support. The General Assembly shall provide for the maintenance, support and eligibility standards of a system of free public schools. The General Assembly may establish and support such postsecondary educational institutions, including public institutions of higher learning, as it determines." The Tennessee Supreme Court has held that "[t]he constitution, therefore, imposes upon the General Assembly the obligation to maintain and support a system of free public schools that affords substantially equal educational opportunities to all students. The means whereby this obligation is accomplished, is a legislative prerogative." *Tenn. Small Sch. Sys. v. McWherter,* 851 S.W.2d 139, 140-41 (Tenn. 1993). In *Tenn. Small Sch. Sys.*, the Tennessee Supreme Court concluded that "[t]he record supports the Chancellor's finding that the disparities in educational opportunities available to public school students throughout the state, found to be constitutionally impermissible, have been caused principally by the statutory funding scheme, which, therefore, violates the constitutional guarantee of equal protection." *Id.* at 156. It is Plaintiffs' contention that the ESA Act deprives students in Davidson and Shelby County schools of adequate and substantially equal educational opportunities. The issue at hand, however, simply is whether Plaintiffs have standing to bring their claim. We therefore apply the elements of standing to the facts alleged by Plaintiffs.

Here, Plaintiffs have alleged that, as parents of children in the only two school districts where the ESA Act applies, they are distinctly and palpably injured by the diversion of funds from their districts to private education purposes.[5] Plaintiffs emphasize that it is only Davidson and Shelby County parents and students who are affected thusly. Plaintiffs alleged further that their injury is traceable to the ESA Act's requirement that the funds be diverted. Regarding redressability, Plaintiffs' alleged injury could be redressed judicially in the form of a court order declaring the ESA Act unconstitutional and ordering an injunction against the ESA Act's implementation. Plaintiffs have thus met each of the elements of standing as parents.

Nevertheless, Defendants argue that any harm to Plaintiffs is purely speculative. They contend that, should there ever be any loss of funds in Plaintiffs' districts, such a

---

[5] We note the Trial Court's observation that Plaintiff Russell does not claim to have a child affected by the ESA Act and seeks standing only as a taxpayer.

shortfall would not occur until at least three years after the ESA Act's implementation. In their brief, State Defendants note, among other things, that "[t]he chancery court found that funding from the school improvement fund accounted for any loss of money for the first three fiscal years of the program."

State Defendants are correct in that the Trial Court found that, thus far, there has been no loss of money by the counties or schools at issue. However, Plaintiffs did not allege that. As a matter of fact, Plaintiffs alleged the opposite. Plaintiffs alleged that the ESA Act's purported measures to soften or eliminate loss of funds by the affected districts do not work and that the counties continue to lose funds. Whether that is ultimately proven is not before us as this case is only at the motion to dismiss stage. On a motion to dismiss, the Tennessee Supreme Court has told us quite clearly that courts are required to accept a plaintiff's factual allegations as true and construe them in the non-moving plaintiff's favor, not the moving defendant's favor. At the motion to dismiss stage, a plaintiff's alleged facts are presumed to be true for purposes of the motion and a defendant must assert that, even if everything the plaintiff alleges is true, she still is not entitled to relief or, as in the appeal at bar, she lacks standing.

By deciding that the school improvement funds accounted for any lost money in the first three years of the program, the Trial Court erroneously resolved a factual dispute at the motion to dismiss stage. In their amended complaint, Plaintiffs set out in great detail their factual allegations why the school improvement funds are not an adequate replacement for the funds their districts lose under the ESA Act. Plaintiffs alleged, for example, that "if available, [school improvement funds] cannot be used for general operating funds and consequently will not replace the state and local BEP funds diverted from Shelby County Schools and Metro Nashville Public Schools under [the ESA Act]." Whether that or Plaintiffs' other factual allegations are ultimately proven is not before us. What matters now is that Plaintiffs have alleged an illegal diversion of funds from their districts resulting in a loss not shared by other districts in Tennessee. Our Supreme Court has not said that we are stuck with a plaintiff's factual allegations unless it is unlikely they can be proven. The Trial Court, and this Court, are stuck with Plaintiffs' factual allegations at this stage of the case. Here, the Trial Court resolved a factual dispute at the heart of the case at the motion to dismiss stage. Under the applicable standard of review, this was reversible error. Given Plaintiffs' detailed factual allegations, Plaintiffs have established standing as parents of children in the affected localities.

Plaintiffs argue further that, in addition to their standing as parents, they also have standing as taxpayers to challenge the ESA Act. Regarding taxpayer standing, this Court has stated:

Tennessee courts diverge from the federal courts' approach with regard to taxpayer standing. As a general rule, "[t]he mere status of a taxpayer or voter is not sufficient to bring an action in and of itself." *Parks v. Alexander*, 608 S.W.2d 881, 885 (Tenn. Ct. App. 1980). There are, however, essentially two routes for taxpayers seeking to establish standing in Tennessee. One route hews more closely to the conventional standing analysis delineated above in addressing the Couple's standing. When traversing this route to establish standing, a taxpayer must assert a " 'special interest or a special injury not common to the public generally.' " *Fannon v. City of LaFollette*, 329 S.W.3d 418, 427 (Tenn. 2010) (quoting *Bennett v. Stutts*, 521 S.W.2d 575, 576 (Tenn. 1975)); *see also Patten v. City of Chattanooga*, 65 S.W. 414, 420 (Tenn. 1901). The second route, which has been long recognized by Tennessee courts, significantly departs from conventional federal taxpayer standing, providing an "exception" to the rule that a special interest or injury is necessary to establish standing. *See Fannon*, 329 S.W.3d at 427; *Badgett v. Rogers*, 436 S.W.2d 292, 294 (Tenn. 1968); *Lewis v. Cleveland Mun. Airport Auth.*, 289 S.W.3d 808, 816 (Tenn. Ct. App. 2008); *City of New Johnsonville v. Handley*, No. M2003-00549-COA-R3-CV, 2005 WL 1981810, at *13 (Tenn. Ct. App. Aug. 16, 2005); *Ragsdale v. City of Memphis*, 70 S.W.3d 56, 62-63 (Tenn. Ct. App. 2001). When traversing this second route, Tennessee courts "typically confer standing when a taxpayer (1) alleges a 'specific illegality in the expenditure of public funds' and (2) has made a prior demand on the governmental entity asking it to correct the alleged illegality." *Fannon*, 329 S.W.3d at 427; *see also, e.g., Lewis*, 289 S.W.3d at 817 (indicating that "this Court in *City of New Johnsonville* acknowledged that the Supreme Court in *Cobb* [*v. Shelby County Bd. of Comm'rs*, 771 S.W.2d 124 (Tenn. 1989)] required three elements to establish taxpayer standing: (1) taxpayer status; (2) specific illegality in the expenditure of public funds; and (3) the taxpayer has made a prior demand on the governmental entity asking it to correct the claimed illegality"); *Ragsdale*, 70 S.W.3d at 62 (stating that, "[i]n order for Plaintiffs to have standing to challenge the legality of the expenditure of public funds, the Plaintiffs must satisfy three requirements: (1) taxpayer status; (2) an allegation of a specific illegality in the expenditure of public funds; and (3) prior demand").

*Rutan-Ram v. Tenn. Dep't of Children's Servs.*, No. M2022-00998-COA-R3-CV, 2023 WL 5441029, at *17 (Tenn. Ct. App. Aug. 24, 2023), *R. 11 perm. app. filed Oct. 23, 2023*.

In *Rutam-Ram*, which also was decided on a motion to dismiss, we found "no support for the limitations proposed by Defendants and conclude that the taxpayer standing

requirements are the same for state and local taxpayers." *Id*. at *21. We held there that the taxpayer-plaintiffs had standing to sue based on their allegations that the Department of Children's Services and its commissioner were "'violating the religious-freedom and equal-protection guarantees of the Tennessee Constitution by funding a child-placing agency that discriminates in state-funded programming against prospective and current foster parents based on the parents' religious beliefs.'" *Id*. The parallels to the present case are striking.

There are two paths to taxpayer standing at issue. The first is that of special injury not common to the public at large. The second is based on an allegation of specific illegality in the expenditure of public funds, and prior demand. In some instances, a failure to make prior demand can be excused if demand would have been a mere formality. *See Ragsdale v. City of Memphis*, 70 S.W.3d 56, 63 (Tenn. Ct. App. 2001). Beginning with special injury, Plaintiffs have alleged that as taxpayers in Davidson and Shelby Counties, they face a special tax burden under the ESA Act that taxpayers elsewhere in Tennessee do not face. Plaintiffs alleged that they will have to compensate for the ESA Act's diversion of funds by raising local taxes. Defendants, in turn, contend that Plaintiffs have incurred no such harm. Even still, this is the motion to dismiss stage, and we must take Plaintiffs' factual allegations as true. Plaintiffs have alleged a special injury not common to the general public, which gives rise to their standing as taxpayers to challenge the ESA Act. Plaintiffs have alleged further that this special injury is a result of the diversion of funds under the ESA Act, and that the injury is redressable through a court order enjoining implementation of the ESA Act. Plaintiffs have thus shown standing for special injury.

In addition to the special injury analysis, Plaintiffs have alleged specific illegality in the expenditure of public funds via the diversion of funds under the ESA Act in violation of the Education and Equal Protection Clauses of the Tennessee Constitution.[6] In *Rutan-Ram*, this Court held that the taxpayer-plaintiffs had standing to pursue their claim arguing that a statute called for an illegal expenditure of public funds on grounds of equal protection and religious freedom. 2023 WL 5441029, at *21. In *Rutan-Ram*, we rejected arguments advanced by State Defendants that specific illegality is restricted to misuse or diversion of local funds and that the challenged act itself must have a fiscal impact to support an allegation of the misuse of funds. *Id*. While we are aware that a Rule 11 perm. app. is still pending, we see no reason to depart from *Rutan-Ram*. Here, Plaintiffs allege violations of equal protection and the education clause of the state constitution. Once again, we take Plaintiffs' factual allegations as true at this stage. Plaintiffs alleged that their counties are singled out for the illegal diversion of public funds, which in turn forces them to raise local taxes. Whether these allegations have any underlying merit is not now the issue. On issues

---

[6] Greater Praise Defendants acknowledge that Plaintiffs have alleged specific illegality for all three counts appealed. However, Greater Praise Defendants argue that prior demand was not excused.

of standing, we look to the parties themselves, not their likelihood of success on the merits of their claims. As our Supreme Court told us in *Metro. Gov't*, 645 S.W.3d at 149, "weakness of a claim on the merits must not be confused with a lack of standing." Plaintiffs have alleged enough to show specific illegality in the expenditure of public funds for purposes of standing at this motion to dismiss stage.

Prior demand is the next part of the specific illegality analysis. Plaintiffs made no demand of the state to halt the allegedly illegal activity. The Trial Court held that Plaintiffs were not excused from making prior demand. However, Plaintiffs alleged in their amended complaint that the ESA Act was painstakingly guided through the General Assembly and that the Governor signed the bill into law. Plaintiffs argue on appeal that, in light of the herculean efforts to pass the ESA Act as alleged in their amended complaint, any demand on their part would have been futile. Indeed, under the facts alleged by Plaintiffs in their amended complaint—facts we are confined to at this stage—prior demand would have been of no avail. The Trial Court held that excusing prior demand in this case would collapse the rule, but that concern is no substitute for evaluating what Plaintiffs actually alleged in their amended complaint and whether prior demand would have been futile given those alleged facts. Based on Plaintiffs' alleged facts, there was no reasonable likelihood that, after the deliberate and laborious efforts to pass the ESA Act, officials would have agreed not to implement the law because Plaintiffs demanded that. Under the facts alleged, any prior demand by Plaintiffs would have been a mere formality. We therefore hold that, at this motion to dismiss stage, Plaintiffs' allegations were sufficient to excuse Plaintiffs from making prior demand. At the motion to dismiss stage, Plaintiffs have established standing both as parents and taxpayers for their challenge to the constitutionality of the ESA Act under the Education and Equal Protection Clauses of the Tennessee Constitution.

We next address whether the Trial Court erred in ruling that Plaintiffs lacked standing to challenge the constitutionality of the ESA Act for violating the requirement of a single system of public schools mandated by the Education Clause of the Tennessee Constitution. As in the previous issue, Plaintiffs assert that they have standing both as parents and taxpayers. With respect to standing as parents, Plaintiffs alleged that their children are harmed by the illegal diversion of funds to support private education at the expense of public education in their districts and nowhere else. Plaintiffs have alleged further that the harm is traceable to the ESA and is redressable by court order. Here again, the merits of Plaintiffs' claim are not at issue. The strength or weakness of the claim is beside the point for purposes of standing at the motion to dismiss stage. The question at this stage is simply whether Plaintiffs have alleged a distinct and palpable injury, a causal connection to the challenged conduct, and that the harm is redressable by court order. We hold that Plaintiffs have done so. Namely, Plaintiffs, as parents of students in the districts allegedly harmed by a diversion of funds under the ESA Act, have alleged that the ESA Act violates the requirement of a single system of public schools in Tennessee. To hold

otherwise at this stage of the proceeding would require us to make factual determinations even though our Supreme Court is clear that would be improper. Plaintiffs have demonstrated standing as parents on this issue.

With regard to taxpayer standing, Plaintiffs once again assert special injury and specific illegality. Plaintiffs have alleged that as taxpayers in Davidson and Shelby Counties, they are distinctly burdened by an unconstitutional diversion of public funds under the ESA Act. They assert further that the harm is traceable to the ESA and is redressable by court order. Based on their allegations, Plaintiffs have established standing as taxpayers based on a special injury not common to the public at large.

Plaintiffs also have alleged specific illegality in the form of the ESA Act's diversion of public funds from their districts. The Trial Court failed to treat Plaintiffs' factual allegations as true as the law requires. In addition, for the reasons already discussed, prior demand by Plaintiffs would have been futile based on their factual allegations. We hold that Plaintiffs have alleged enough at the motion to dismiss stage to establish standing as parents and taxpayers to challenge the constitutionality of the ESA Act for violating the requirement of a single system of public schools mandated by the Education Clause of the Tennessee Constitution.

We next address whether the Trial Court erred in ruling that Plaintiffs lacked standing to challenge the ESA Act for violating the Appropriation of Public Moneys provisions of the Tennessee Constitution and Tenn. Code Ann. § 9-4-601.[7] Article II, section 24 of the Tennessee Constitution states, in relevant part: "No public money shall be expended except pursuant to appropriations made by law. . . . Any law requiring the expenditure of state funds shall be null and void unless, during the session in which the act receives final passage, an appropriation is made for the estimated first year's funding." Meanwhile, Tenn. Code Ann. § 9-4-601(a)(1) (West eff. May 16, 2013) provides, as relevant: "No money shall be drawn from the state treasury except in accordance with appropriations duly authorized by law." In their amended complaint, Plaintiffs alleged in part that "TDOE's expenditures for the ClassWallet contract, or any other expenditures for the administration and implementation of the Voucher Law in 2019, without appropriation for the estimated first year's funding of the Voucher Law, render the Voucher Law null and void under Article II, § 24, of the Tennessee Constitution and violate T.C.A. § 9-4-601."

Bah Defendants point to language in certain budget documents from that time to argue that there was no illegality in the appropriation of funds associated with the ESA

---

[7] State Defendants do not argue that Plaintiffs failed to allege specific illegality for their sixth cause of action. Nevertheless, State Defendants contend that prior demand was not excused.

Act. They state that ClassWallet was paid with funds that had been intended originally for a separate but now-discontinued program. Plaintiffs argue in response that Bah Defendants' explanations for how ClassWallet was funded are either irrelevant or create a factual dispute at most. Indeed, we are ruling on standing and ripeness only at the motion to dismiss stage. It is enough that Plaintiffs have alleged that the state, contrary to law, paid an organization to administer the ESA Act without an appropriation for the law's estimated first year of implementation. Plaintiffs have alleged specific illegality with regard to their sixth cause of action. In addition, as we have discussed, prior demand by Plaintiffs would have been futile under the facts alleged. We therefore hold that Plaintiffs have alleged enough to establish standing to challenge the ESA Act for violating the Appropriation of Public Moneys provisions of the Tennessee Constitution and Tenn. Code Ann. § 9-4-601.

The final issue we address is whether the Trial Court erred in ruling that Plaintiffs' claims were not ripe. The Tennessee Supreme Court has explained the doctrine of ripeness thusly:

> Doctrines such as ripeness assist the courts in determining whether a particular case presents a justiciable legal issue. *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 203 (Tenn. 2009). The ripeness doctrine focuses on whether the dispute has matured to the point that it warrants a judicial decision. The central concern of the ripeness doctrine is whether the case involves uncertain or contingent future events that may or may not occur as anticipated or, indeed, may not occur at all. *See Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 479-80, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). It is closely related to the "exhaustion of administrative remedies" doctrine. 13B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3532.1.1 (3d ed. 2008).

> Determining whether a particular dispute is ripe entails a two-part inquiry. The first question is whether the issues in the case are ones appropriate for judicial resolution. The second question is whether the court's refusal to act will cause hardship to the parties. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *partially superseded by statute*, Clean Air Amendments of 1970, Pub.L. No. 91-604, 84 Stat. 1676 (codified as amended at 42 U.S.C.A. § 7607 (1997 & 2010 Supp.)); *accord Martin v. Washmaster Auto Ctr., Inc.*, No. 01-A-01-9305-CV00224, 1993 WL 241315, at *2 (Tenn. Ct. App. July 2, 1993) (No Tenn. R. App. P. application filed). The court will decline to act "where there is no need for the court to act or where the refusal to act will not prevent the parties from raising the issue at a more appropriate time." *AmSouth Erectors, LLC*

*v. Skaggs Iron Works, Inc.*, No. W2002-01944-COA-R3-CV, 2003 WL 21878540, at *6 (Tenn. Ct. App. Aug. 5, 2003) (No Tenn. R. App. P. 11 application filed) (quoting *Window Gallery of Knoxville v. Davis*, No. 03A01-9906-CH-00225, 1999 WL 1068730, at *3 (Tenn. Ct. App. Nov. 24, 1999) (No Tenn. R. App. P. application filed)) (emphasis omitted).

*B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 848-49 (Tenn. 2010).

Plaintiffs argue that their first cause of action is ripe because they have alleged that the ESA Act's adverse impact on Davidson and Shelby County schools is underway now and that the increased tax burden from the diversion of funds likewise began with the implementation of the ESA Act. As for their second cause of action, Plaintiffs contend that the illegal diversion of funds damages the single system of public schools in Tennessee in the here and now; that it is not speculative; and that now is the appropriate time to address it. Regarding their sixth cause of action, Plaintiffs point out that all facts relevant to this particular claim already have occurred.[8] Plaintiffs state further that they will suffer meaningful hardship if judgment is withheld because their children's schools are being deprived of educational resources.

For their part, State Defendants argue that Plaintiffs' first and second causes of action are not ripe. They say that local education agencies will keep certain TISA funds associated with participating students without the corresponding obligation to educate them; that for the first three years of the ESA Act, an annual grant in an amount equal to the amount in the students' ESA account will be disbursed to the local education agency for school improvement; and that the ESA Act likely will produce a windfall for local education agencies and their students. As to any hardship posed to Plaintiffs, State Defendants contend that Plaintiffs do not face any serious criminal or civil penalties and that, at any rate, the ESA Act only regulates local education agencies, not Plaintiffs.

We reiterate that, under the applicable standard of review, we must take Plaintiffs' factual allegations as true. Plaintiffs have alleged that they being harmed by the implementation of the ESA Act in the here and now, not in a hypothetical future scenario. Plaintiffs have thus alleged a live, active controversy. Whether Plaintiffs' allegations are proven or even likely to be proven is beyond this Opinion. It is enough for purposes of the standard of review on a motion to dismiss that Plaintiffs have alleged that harm to them is unfolding at present and will continue to unfold absent a court order favorable to them. With respect to the hardship aspect of the ripeness analysis, Plaintiffs have alleged that the

---

[8] State Defendants concede the ripeness of Plaintiffs' sixth cause of action. This is appropriate as all facts relevant to this claim have in fact already occurred.

ESA Act imposes a heightened tax burden on them specifically and drains their school districts of funds in a manner not experienced by other districts. Defendants have not cited to any law requiring that a plaintiff face criminal or civil penalties before the plaintiff's claim is ripe. To be sure, facing criminal or civil penalties certainly could impose the meaningful hardship necessary for ripeness, but it is not essential. Taking Plaintiffs' factual allegations as true, as we must at this motion to dismiss stage, Plaintiffs' first, second, and sixth causes of action are ripe for judicial review.

We expressly decline to rule on whether Plaintiffs have stated a claim for which relief can be granted. Furthermore, we take no position on the wisdom or unwisdom of the ESA Act, which is a legislative matter. The standard of review on a motion to dismiss compels the result we reach. In sum, we hold that Plaintiffs have alleged enough at the motion to dismiss stage to establish standing to assert their first, second, and sixth causes of action. We hold further that Plaintiffs' claims are ripe for judicial review. We reverse the judgment of the Trial Court as to Plaintiffs' first, second, and sixth causes of action and remand for further proceedings consistent with this Opinion.

## Conclusion

The judgment of the Trial Court is reversed as to Plaintiffs' first, second, and sixth causes of action, and this cause is remanded to the Trial Court for collection of the costs below and further proceedings consistent with this Opinion. The costs on appeal are assessed against the Appellees.

_____
D. MICHAEL SWINEY, CHIEF JUDGE